ASPEN SKIING COMPANY, Petitioner,

v.

Leslie PEER, Respondent.

No. 89SC548.

Supreme Court of Colorado,
En Banc.

Jan. 14, 1991.

Rehearing Denied Feb. 4, 1991.

Arnold & Porter, James E. Scarboro, Tim Atkeson, Barry K. Arrington, Alfred T. McDonnell, Denver, for petitioner.

Goss & Waltz, Douglas K. Goss, Sherman & Howard, Lee Dale, Denver, for respondent.

Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the unpublished decision of the court of appeals in *Peer v. Aspen Skiing Co.*, No. 88CA0190 (August 10, 1989), which affirmed the trial court's denial of a motion for a new trial filed by the defendant, Aspen Skiing Co. (Aspen Skiing), based on newly discovered evidence in the form of allegedly perjured testimony offered by the plaintiff, Leslie Peer, in the trial of his personal injury claim. The court of appeals did not consider the allegedly perjurious nature of Peer's testimony, but instead held that Aspen Ski-

ing had failed to establish reasonable diligence in discovering the evidence. We agree with the court of appeals' conclusion that Aspen Skiing failed to satisfy the reasonable diligence requirement, and we also hold that Aspen Skiing failed to demonstrate that Peer gave perjured testimony during the trial. We accordingly affirm the judgment of the court of appeals.

## I.

A summary of the factual and procedural history of this case will place the issue before us in proper focus. In August 1984 Peer sued Aspen Skiing for serious and totally disabling injuries as a result of a skiing accident on Thanksgiving Day, November 25, 1982, which was the first day of the ski season, on a slope known as "Ruthie's Run" located on Aspen Mountain in the City of Aspen and operated by Aspen Skiing. The accident occurred when Peer skied over a steep depression caused by a service road that traversed Ruthie's Run. As a result of the accident, Peer suffered a broken neck and was rendered a quadriplegic. He alleged in his complaint that Aspen Skiing was negligent in creating and maintaining a sudden and steep transition or depression on the slope and in failing to adequately warn skiers of its presence. Aspen Skiing denied any negligence and alleged that Peer assumed the risk of a known danger and that his injuries were caused by his own negligence.

One week after the accident, on December 2, 1982, Richard LaVigne, who was a close friend of Peer and was skiing with him on the day of the accident, made a statement to an investigator about the manner in which the accident occurred. LaVigne told the investigator that he and Peer had been skiing together and were testing a giant slalom ski, which was designed to be skied at very fast speeds, and then stated:

I think the problem was that it was a little after 2, the sun is very low this time of the year here and the light, the sun had just gone behind a cloud and it was very flat light and he had smoke-colored goggles on, dark-colored goggles I

would have to, I'd have to guess that he just didn't see it.

LaVigne acknowledged in his statement that he knew of the presence of the transition in the slope where the accident occurred and told the investigator that Peer "had skied through it two or three times and I'm sure, you know, at one time knew it was there." LaVigne also told the investigator that immediately before the accident he had reduced his speed, then saw that Peer was not slowing down at all but looking beyond the transition, and at that point LaVigne knew that Peer had not seen the transition and was going to have an accident.

After the complaint was filed, Aspen Skiing served Peer with 183 interrogatories. Peer answered these on September 4, 1985. In his answers Peer acknowledged that he was an expert skier and had skied "most if not all of the ski trails on Aspen Mountain" over a period of several years prior to the accident. In another answer Peer stated that he did not know if he had skied Ruthie's Run prior to the accident but he thought he had "skied this trail once each time I skied." Peer acknowledged in his answers that Ruthie's Run was a "more difficult" trail and described the accident as follows:

I was skiing down a slight pitch after the flat of upper Ruthie's Run making turns when I encountered an unexpected irregularity in the slope where there was a sharp drop-off and transition from the slope to the service road. I found myself airborne and weightless. I landed on my head, heard a sharp crack in my neck and became unconscious.

I was traveling downhill in full line preparation to a turn to the left and my speed was comfortable for the conditions and the terrain. I estimate that my speed was approximately 15 to 20 miles per hour at the transition where the accident occurred. In the upper flats I estimate my speed to have been 25 miles per hour. I was generally traveling in a northerly direction.

When asked in the interrogatories to describe any objects or conditions that contributed to the accident, Peer responded:

Failure to post a sign warning of the dangerous condition encountered and permitting this dangerous condition to exist on the slope.

Peer was also asked to identify any witnesses to the accident or witnesses to the events immediately preceding or following the accident. He responded as follows: Richard LaVigne, Post Office Box 7845, Aspen, Colorado, who was skiing with him at the time of the accident; Penny Gage, 3120 Kittrell Court, Boulder, Colorado, and John B. and Jackie Wogan, 1133 Race Street, Denver, Colorado, all of whom were riding the lift and saw the accident; and Michael Teschner, Post Office Box 4638, Aspen, Colorado, who had seen him skiing prior to the accident. Peer also disclosed to Aspen Skiing the following names and addresses of the persons with whom, in addition to LaVigne, he had skied on the date of the accident prior to its occurrence: Carlos Gendron, 512 E. 79th Street, New York City, New York; Jeanie Renchard, Post Office Box 9296, Aspen, Colorado; David Foster, 437 West Smuggler, Post Office Box 8117, Aspen, Colorado; Janet M. Lightfoot, Post Office Box 9456, Aspen, Colorado; and Lefty Brinklman, Aspen, Colorado; and a person by the name of Marty.

In 1985, approximately three years after the accident and two years prior to trial, Aspen Skiing deposed LaVigne and Peer. During LaVigne's deposition, Aspen Skiing asked him to review his statement of December 2, 1982, and to correct or explain any inaccuracies in the statement. LaVigne responded as follows:

There are a couple of things that do not seem accurate. And I know I said these things. I indicated in a couple of different paragraphs that Les [Peer] had skied that run two or three previous. As I think about it now, I don't think that he had skied that run previously. I had skied it two or three times previously, but I don't believe—I am not positive. He may have skied it on his own. You would have to ask him.

In the course of deposing Peer, Aspen Skiing also confronted him with LaVigne's statement to the investigator. Peer stated that he had not skied Ruthie's Run earlier that day but indicated that he would need a map of Aspen Mountain "to be able to say for sure" what trails he had skied prior to the accident. Peer also testified in his deposition as follows:

Q: Have you by any chance reviewed a statement given by Dick LaVigne?

A: I think I have. Yes.

Q: Do you recall in that statement ... he [LaVigne] at one point in his statement indicated that you and he had skied Ruthie's [Run] two or three times earlier that day[?]

A: I think he's in error in that. I think that was a bit of a traumatized day for [LaVigne] and I think it's possible that—

Q: Do you recall that statement he made, because I'll show it to you[?]

A: No. I've been shown the statement.

Q: So you know the statement to which I'm referring?

A: Yes, I do.

Q: And you think he's in error about that particular aspect of the statement?

A: Yes.

Trial to a jury commenced on September 24, 1987. In opening statement Peer's counsel told the jury that the evidence would show that Peer was skiing Ruthie's Run with LaVigne and was approaching the area where the service road traversed the slope, that LaVigne tried to yell a warning to Peer about the steep transition but was unsuccessful, that Peer hit the transition and fell, and that Aspen Skiing was negligent in permitting an extremely dangerous condition to exist on the slope and in failing to warn skiers of its presence. Aspen Skiing, in its opening statement, told the jury that it would establish that the cause of the accident was the high rate of speed at which Peer was skiing "for this first run of the trail on the first day of the season."

The evidence at trial established that on the day of the accident there were numerous ski trails on Aspen Mountain, each with

a different name and some of them intersecting one or more other trails at various points from the top of the mountain to the bottom. There were several chairlifts which carried skiers to various locations on the mountain. One of the chairlifts was located at the bottom of Ruthie's Run and carried skiers directly over Ruthie's Run. A skier could also reach Ruthie's Run by skiing trails commencing at the end of other chairlifts. There were numerous ski trails that angled off of the main trail serviced by the chairlift located at the bottom of Ruthie's Run.

Ruthie's Run was about 300 feet wide at the area where the service road traversed the run. There was a sudden and severe drop at varying degrees at different points along the intersection of the slope and the service road. The transition encountered by Peer consisted of a drop of four or five feet at an angle of approximately 90 degrees.

LaVigne testified at trial and stated that he had not previously skied Ruthie's Run with Peer on the day of the accident, but that he had skied the run by himself two or three times. According to LaVigne's trial testimony, at the time of the accident he and Peer were skiing Ruthie's Run when suddenly LaVigne realized that they were coming to the transition and that Peer had not yet skied that area. LaVigne testified that he spun his own skis sideways to slow down and yelled at Peer to get his attention because he was skiing toward the transition. Peer, however, did not hear LaVigne's warning and hit the transition. According to LaVigne, Peer was skiing at about 35 to 40 miles per hour and "was in absolutely perfect control, in a very neutral, relaxed stance, just skiing down the mountain."

Aspen Skiing did not attempt to impeach LaVigne on the basis of his statement of December 2, 1982, in which he told the investigator that Peer had previously skied Ruthie's Run two or three times on the day of the accident. Instead, Aspen Skiing extensively cross-examined LaVigne in an effort to establish that Peer was skiing much too fast at the time of the accident. Aspen

Skiing, for example, questioned LaVigne about a statement he made to a patrolman immediately after the accident, when he was at the hospital with Peer, in which he stated that Peer was skiing "very fast." LaVigne acknowledged that he had been given the opportunity to review this statement a few days later, after it was typed, and upon reviewing it he crossed out the words "very fast." He did so because he was "very emotional" at the time he made the statement and had no recall of anything that he might have said to the patrolman. LaVigne testified that "if I changed something on the statement it's because that's what I thought was accurate." Aspen Skiing also cross-examined LaVigne about that part of his December 2, 1982, statement to the investigator in which LaVigne stated that the sun had just gone behind a cloud at the time of the accident, resulting in very flat light on the slope, that Peer was wearing "dark-colored goggles" and that "I'd have to guess that he just didn't see [the transition]." LaVigne on cross-examination admitted making the statement to the investigator and acknowledged that it was correct.

Peer testified at trial that the accident occurred on his first ski run down Ruthie's run on that day. He acknowledged that he had skied Ruthie's Run on several occasions during years prior to the accident, and that he was aware of a slight transition in the area but not to the same extent as the transition that existed on the day of the accident. On direct examination, he testified as follows:

Q: Okay, on the day that this accident occurred, had you skied elsewhere on Aspen Mountain before you skied Ruthie's Run?

A: Yeah. I'm not really good at remembering the names of trails, but I know I went up the mountain and I skied I think Sunset, I'm not sure; and then up the upper part of the mountain. I couldn't tell you exactly what I skied or—if I had a map I could probably point to the general areas. We could do that

later if you like. And then I sat for lunch with my friend.

* * * * * *

Q: Did you ski any other slopes with Dick LaVigne before getting to Ruthie's Run?

A: Yeah, we would have had to. We skied—again, I don't know any names [of trails] so—the front of the mountain there.

Q: Was this your first time down Ruthie's Run, when the accident happened?

A: Yeah, it was.

Q: And that is the first time down on the day of the accident?

A: Yeah—wait. Yeah, I think that is. Sorry, I hope I'm not confusing. Go ahead.

Q: I'll get back to this later. On prior times out to Colorado, had you skied Ruthie's Run?

A: Yes, I had.

Peer also acknowledged that, although he was "skiing in control" and "was comfortable" skiing Ruthie's Run at the time of the accident, the accident probably would not have occurred if he had been skiing significantly slower. On cross-examination, he testified as follows:

Q: Now, this accident occurred on your first run on Ruthie's Run on opening day?

A: Yes, it was.

Q: You hadn't skied Ruthie's [Run] earlier that day?

A: No, I hadn't.

Aspen Skiing, in its case, presented the deposition testimony of two witnesses, John and Jacqueline Wogan, who were riding a chairlift over Ruthie's Run when the accident occurred. John Wogan stated that he observed two skiers skiing down Ruthie's Run at a speed considerably faster than other skiers. He saw the lead skier, who was Peer, make a sweeping turn. This skier, according to Wogan, then "hit the road ... and exploded out of his ski togs, lost his hat, skis and poles, did a half somersault and landed on the back of his neck." Shortly before the accident, Wogan heard the other skier, who was LaVigne, warn Peer to "watch out for the road or words to that effect." Jacqueline Wogan, who gave a similar account of the accident, stated that she particularly noticed the extremely high rate of speed at which Peer was skiing down Ruthie's Run.

During summation, Peer argued to the jury that Aspen Skiing was negligent in creating and maintaining a sudden and sharp transition or depression on Ruthie's Run without providing any advance notice or warning to skiers. Aspen Skiing, in contrast, argued that the sole cause of the accident was Peer's negligence in skiing much too fast, especially in light of the fact that it was his first run down Ruthie's Run on the day of the accident. At the conclusion of a three-week trial, the jury returned a verdict finding Aspen Skiing one-hundred percent negligent in causing Peer's injuries and assessed Peer's damages at $5,000,-000.00.

Less than a month after the trial Aspen Skiing moved for a new trial pursuant to C.R.C.P. 59(d)(4) and C.R.C.P. 60 on the basis of newly discovered evidence which, according to Aspen Skiing, established that Peer had apparently lied when he testified that the accident occurred on his first run down Ruthie's Run. In support of its motion, Aspen Skiing filed the affidavits of two Aspen residents and one frequent Aspen visitor who claimed that they saw Peer skiing on Ruthie's Run prior to the accident. One of the affiants stated that he knew Peer on the day of the accident and that he had seen him skiing Ruthie's Run at least two times in the early afternoon prior to the accident. The second affiant stated that he had observed Peer "skiing Ruthie's Run at least two times" on the day of the accident. The third affiant stated that he observed a man "skiing Ruthie's Run at high speed who appeared to be skiing with another man, also skiing at high speed," that he "took note of these individuals because they were skiing so much faster than the conditions warranted," and that he later observed a man who he believed was one of these individuals lying "motionless on the snow on the upper section of Ruthie's Run." The three affi-

ants concluded their affidavits by stating that they learned about the result of Peer's lawsuit through newspaper accounts of the litigation.

In opposing the motion for a new trial, Peer argued that Aspen Skiing should have discovered this additional evidence prior to trial and that it should be bound by its tactical decision to defend the case on the basis that Peer was negligent in skiing at such a high rate of speed on his first run down Ruthie's Run. The trial court adopted these arguments in denying the motion for a new trial. It then assessed interest and costs on the jury verdict of $5,000,000.00 and entered judgment for $7,596,935.75.

Aspen Skiing appealed to the court of appeals, which affirmed the judgment in an unpublished opinion. The court of appeals did not specifically address whether Aspen Skiing had established that Peer committed perjury during the trial, but instead concluded that Aspen Skiing had failed to establish reasonable diligence in obtaining the additional evidence. We granted Aspen Skiing's petition for certiorari to consider whether the court of appeals erred in affirming the trial court's denial of the motion for a new trial.

Aspen Skiing basically claims that its motion for a new trial, along with the supporting affidavits, satisfied all the requirements for a new trial based on Peer's perjurious testimony during the first trial. We will first consider whether Aspen Skiing satisfied the three-part test for a new trial predicated on newly discovered evidence and then we will consider whether Aspen Skiing's evidence demonstrated that Peer committed perjury in testifying during the trial.

## II.

C.R.C.P. 59(d)(4) states that a new trial may be granted on the ground of "[n]ewly discovered evidence, material for the party making the application which that party could not, with reasonable diligence, have discovered and produced at the trial." Our case law, consistent with the text of this rule, has adopted a three-part test for

resolving a motion for a new trial based on newly discovered evidence: first, the applicant must establish that the evidence could not have been discovered by the exercise of reasonable diligence and produced at the first trial; second, it must be shown that the evidence was material to an issue in the first trial; and third, the applicant must establish that the evidence, if admitted, would probably change the result of the first trial. *E.g., People v. Distel,* 759 P.2d 654, 660 (Colo.1988); *People in the Interest of P.N.,* 663 P.2d 253, 256 (Colo.1983); *Kennedy v. Bailey,* 169 Colo. 43, 47, 453 P.2d 808, 810 (1969). These three factors are not discrete items that lend themselves to a mechanistic application, but rather are closely interrelated and require the exercise of a prudential judgment informed primarily by considerations of fundamental fairness to the litigants. Considerable discretion is vested in the trial court in ruling on a motion for a new trial, and its ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. *E.g., People in the Interest of P.N.,* 663 P.2d at 256; *Bushner v. Bushner,* 141 Colo. 283, 286–87, 348 P.2d 153, 154 (1959); *Schlessman v. Brainard,* 104 Colo. 514, 520, 92 P.2d 749, 752 (1939); *Morgan v. Gore,* 96 Colo. 508, 512–13, 44 P.2d 918, 920 (1935). To say that a court has discretion in resolving a motion for a new trial based on newly discovered evidence simply means that it has the power to choose between two courses of action "and is therefore not bound in all cases to select one over the other." *People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987); *Buckmiller v. Safeway Stores, Inc.,* 727 P.2d 1112, 1115 (Colo. 1986).

The requirement of reasonable diligence is grounded in the principle of finality. A party is expected to gather all available evidence prior to trial and evaluate and submit such evidence as is consistent with the party's theory of litigation. *See People In the Interest of P.N.,* 663 P.2d at 256–258. Reasonable diligence is established when the proponent of the motion demonstrates that the new evidence was not only unknown prior to the first

trial but also could not have been timely discovered through reasonable efforts. *Buchanan v. Burgess,* 99 Colo. 307, 310–311, 62 P.2d 465, 466–467 (1936). The record in this case establishes that the "reasonable diligence" requirement was not met.

Aspen Skiing had actual notice prior to trial of the inconsistency between Peer's pretrial deposition testimony that the accident occurred on his first run down Ruthie's Run and LaVigne's pretrial statement of December 2, 1982, that Peer had skied the run two or three times prior to the accident. Approximately two years prior to trial, Aspen Skiing deposed both LaVigne and Peer and confronted them with LaVigne's statement. LaVigne testified at his deposition that his prior statement was inaccurate and that he did not think Peer had previously skied Ruthie's Run on the day of the accident. Peer stated during his deposition testimony that LaVigne was apparently confused in his statement to the investigator about the sequence of events preceding the accident. During the two-year interval between LaVigne's and Peer's depositions and the trial, Aspen Skiing had substantial resources at its disposal to locate witnesses who might possibly have been able to confirm whether or not Peer had previously skied Ruthie's Run on the day of the accident. The fact that within a month following the trial Aspen Skiing was able to offer the affidavits of two local residents and a frequent Aspen visitor in support of its new trial motion plainly refutes any claim that reasonable diligence would not likely have led to the discovery of such evidence prior to trial. *People v. Distel,* 759 P.2d at 660. Aspen Skiing made the tactical decision to construct a defense not based on the theory that Peer had previously skied Ruthie's Run on the day of the accident but rather based on the theory that Peer, an expert skier, had negligently caused his injuries by skiing much too fast on his first run down Ruthie's Run. Under these circumstances, we cannot say that either the trial court or the court of appeals erred in concluding that Aspen Skiing failed to exercise reasonable diligence in discovering the new evidence.

Although the failure of Aspen Skiing to satisfy the "reasonable diligence" requirement renders it unnecessary to consider the other two requirements of the three-part test, we address them briefly here. These two requirements involve the element of materiality and the likelihood of the new evidence changing the result of the first trial. If the requirement of reasonable diligence had been satisfied in this case, the testimony of witnesses establishing that Peer previously had skied Ruthie's Run on the day of the accident could be viewed as directly supportive of a theory of contributory negligence predicated on the fact that Peer at the time of the accident was not confronted with a sudden and unknown danger but rather had previously skied that area and hence was under a legal duty to negotiate the slope within the limits of his ability. *See* § 33–44–109(1), 14 C.R.S. (Supp.1990). Aspen Skiing, however, knew of this theory of defense by virtue of the statement made by LaVigne to the investigator approximately one week after the accident, but nonetheless chose to defend the case on what Aspen Skiing believed was a more persuasive theory of contributory negligence—namely, that Peer had been skiing much too fast for his first run on the slope where the accident occurred. Aspen Skiing's decision to forego, as a matter of trial strategy, a theory of defense based on evidence showing that Peer had previously skied Ruthie's Run on the day of the accident vitiated its claim that the other two requirements of the three-part test were satisfied. *See In the Interest of P.N.,* 663 P.2d at 256–58.

### III.

■ We turn to Aspen Skiing's claim that the jury verdict was obtained as a result of Peer's perjured testimony. C.R. C.P. 60(b)(2) states that a court may relieve a party from a final judgment because of "fraud," "misrepresentation," or "other misconduct." This rule is a recognition of the fact that while "it is important to have an end to litigation, ... it is even more important that the end should be right." *Bushner,* 141 Colo. at 285, 348 P.2d at 154

(quoting *Townley v. A.C. Miller Co.*, 139 Ohio St. 153, 164, 38 N.E.2d 578, 583 (1941)). A litigant's use of perjured testimony to secure a jury verdict so corrupts the integrity of the factfinding process that a court may dispense with the requirement of reasonable diligence and set aside the verdict when the newly discovered evidence, even though in the nature of impeachment evidence, establishes that perjured testimony impaired a party's ability to fairly and fully litigate a material issue in the case. *TAS International Travel Service, Inc. v. Pan American World Airways, Inc.*, 96 F.R.D. 205, 207–208 (S.D.N.Y.1982); *see generally Denver City Tramway Co. v. Brier*, 60 Colo. 235, 239–40, 152 P. 901, 902–903 (1915).

We must be mindful that there is a critical difference between perjury and the mere presence of factual conflicts or deficiencies in the evidence. A trial involves an effort to reconstruct the historical facts of a legally significant incident on the basis of testimonial and other evidence from persons claiming to have some knowledge of the incident. More often than not, any hotly contested trial of any duration involving testimony from several witnesses will generate inconsistencies, contradictions, lapses of memory, and oftentimes unexplained voids in the evidence. These conflicts or deficiencies, however, are not necessarily indicative of perjury.

■ Perjury is committed when a witness testifies under oath to a materially false statement in an official proceeding, such as a trial, under circumstances where the witness does not believe the statement to be true. § 18–8–502(1), 8B C.R.S. (1986); *see People v. District Court*, 192 Colo. 480, 482, 560 P.2d 463, 464 (1977); *Marrs v. People*, 135 Colo. 458, 463, 312 P.2d 505, 508 (1957). The proponent of a motion for a new trial based on newly discovered evidence of perjured testimony at the first trial must show that the discrepancies or inaccuracies in the prior testimony were not the result of the usual shortcomings inherent in human perception and memory but rather were the result of a willful fabrication of evidence bearing on a material issue. *E.g.*, *Schlessman v. Brainard*, 104 Colo. at 519–20, 92 P.2d at 752; *Buchanan v. Burgess*, 99 Colo. at 310, 62 P.2d at 466.

■ Aspen Skiing bases its claim of perjury on the affidavits of two Aspen residents and a frequent visitor to the area, all of whom claimed that they saw Peer skiing down Ruthie's Run earlier on the day of the accident. These affidavits, however, do not establish that Peer perjured himself at his deposition or at trial when he stated that the accident occurred on his first run down Ruthie's Run. LaVigne made clear in his pretrial deposition that he believed, but was not absolutely certain, that he was in error in telling the investigator on December 2, 1982, that Peer had previously skied Ruthie's Run on the day of the accident. When Aspen Skiing deposed Peer and confronted him with LaVigne's statement that he (Peer) had skied Ruthie's Run two or three times earlier on the day of the accident, Peer stated that he also thought LaVigne's prior statement to the investigator was inaccurate.

Moreover, there was considerable evidence corroborating Peer's version of the accident. LaVigne, for example, testified that he and Peer were skiing Ruthie's Run when suddenly LaVigne realized that they were coming upon the transition and that Peer had not skied that area previously. LaVigne went on to describe how at that point in time he spun his own skis sideways to slow down and shouted at Peer to warn him of the transition. Peer, according to LaVigne, did not hear the warning and hit the transition. LaVigne's testimony about his shouting a warning to Peer was corroborated by the deposition testimony of one of the defendant's witnesses, John Wogan. It seems unlikely that LaVigne, who had skied Ruthie's Run earlier, would shout a warning to Peer if LaVigne had believed that Peer also had skied that area of the transition earlier on the same day.

Furthermore, the record shows that on the day of the accident there were many ski trails on Aspen Mountain in addition to Ruthie's Run, that Peer and LaVigne had skied several of those trails earlier on that

day, and that Peer generally did not remember the names of the trails on which he had skied. Peer could have skied from some other ski trail higher on the mountain to the trail under the Ruthie's Run chairlift, skied that trail for a very brief distance, and then switched over to another trail without ever realizing that he had skied on Ruthie's Run. The record also shows that Ruthie's Run is approximately 300 feet wide at the point where the service road traverses the ski run, and on the day of the accident the degree of transition varied greatly at various points along the intersection of the road and the run. If earlier on the day of the accident Peer had skied over the service road traversing Ruthie's Run but had skied at a point considerably distant from the site of the accident, his unfamiliarity with the names of the various ski trails could easily account for his unawareness of what particular trail he was on at that time, especially since he would have had no reason to identify the trail by name.

The number of intersecting trails on Aspen Mountain, each with a different name, and the varied combination of trails that a skier could follow from the top of a particular chairlift to the bottom, can adequately account for any discrepancy between Peer's deposition and trial testimony that he had not previously skied Ruthie's Run on the day of the accident and the post-trial affidavits of those persons who claimed that they had seen Peer skiing on Ruthie's Run earlier on the day of the accident. If Aspen Skiing had presented evidence that Peer had admitted to some other person that he had fabricated his version of the accident or had persuaded or had attempted to persuade LaVigne or other witnesses to do so, we would have no hesitation in reversing the judgment of the court of appeals. What we have here, however, is a case of varied observations and recollections, some inconsistency and contradiction, and an understandable degree of uncertainty and inaccuracy in reconstructing an event that occurred five years prior to the trial on a mountain with a complex configuration of ski trails. Rather than imputing perjured testimony to Peer, we believe the normal fallacies of human observation and memory can reasonably explain the divergent recollections of various witnesses concerning the events surrounding the accident in question.

We find this court's observations in *Whiting v. Williams*, 95 Colo. 252, 35 P.2d 493 (1934), particularly appropriate to the controversy before us. In affirming the trial court's denial of a motion for new trial based on allegedly perjured testimony, this court stated that "the evidence presented by the record may well be interpreted without imputing dishonest motives to anyone; it does not indicate more than the usual amount of inaccuracy, nor was any of the errors necessarily intentional or corrupt." 95 Colo. at 254, 35 P.2d at 494. Although in the instant case the trial court, in ruling on the motion for a new trial, did not specifically refer to Aspen Skiing's claim of perjury, it obviously was aware that such claim was central to Aspen Skiing's request for a new trial. The trial court, as the trial court in *Whiting*, "observed all the witnesses on the witness stand" and "approved of the verdict and refused to set it aside." 95 Colo. at 254–55, 35 P.2d at 494. Under the state of the record, we decline to second-guess the trial court's exercise of discretion in denying the motion for a new trial.

The judgment of the court of appeals is accordingly affirmed.