Charlotte ZOLMAN, Plaintiff–Appellant,

v.

**PINNACOL ASSURANCE,**
Defendant–Appellee.

No. 09CA1954.

Colorado Court of Appeals,
Div. II.

March 3, 2011.

Bisset Law Firm, Jennifer E. Bisset, Englewood, Colorado, for Plaintiff–Appellant.

Vaughan & DeMuro, David R. DeMuro, Michael J. Steiner, Shelby A. Felton, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge LOEB.

In this insurance bad faith case, plaintiff, Charlotte Zolman, appeals the district court's summary judgment in favor of defendant, Pinnacol Assurance (Pinnacol). Zolman also appeals the court's denial of her C.R.C.P. 59 motion for reconsideration. We affirm.

## I. Background and Procedural History

Zolman was employed as a personal companion by Horizon Home Care, LLC (Horizon). This job required her to provide a variety of non-medical home care services to elderly or disabled individuals. On December 3, 2004, Zolman injured her lower back as she was lifting a client's wheelchair up a step. She subsequently filed a workers' compensation claim with Pinnacol, which was Horizon's workers' compensation insurance carrier at the time.

We begin our discussion with a summary of Zolman's medical care and workers' compensation claim to provide the factual background for the bad faith complaint that underlies this appeal.

### A. Medical Opinions Prior to the Administrative Order

Zolman was first examined for her lower back injury on December 6, 2004, by Dr. Danahey of Concentra, the physician's group designated by Horizon as its primary medical provider for work-related injuries. At this initial visit, Dr. Danahey ordered x-rays of Zolman and told her that her injury was consistent with a compression fracture. He also sent her for a CT scan the next day, which confirmed a compression fracture at the L5 vertebrae. Dr. Danahey became the authorized treating physician (ATP) for Zolman's workers' compensation claim.

Dr. Danahey then referred Zolman to Dr. Reiss, an orthopedic surgeon, who also became an ATP for her claim. Dr. Reiss examined Zolman on December 22, 2004. He similarly diagnosed her with an acute compression fracture at L5, stating that the fracture was stabilizing and would probably take two to three months to heal.

Pinnacol filed a general admission of liability for medical benefits and temporary total disability benefits based upon the initial examinations by Drs. Danahey and Reiss.

Dr. Reiss monitored Zolman's injury over the next several months. In April 2005, an MRI showed that the fracture had nearly stabilized. In May, a final x-ray confirmed that Zolman's fracture was stable, and Dr. Reiss discharged her from his care.

In May 2005, Dr. Danahey referred Zolman to Dr. Primack, a rehabilitation specialist, who became the third ATP for Zolman's workers' compensation claim. When Dr. Primack first examined Zolman on May 10, 2005, he agreed with the prior diagnoses of Drs. Danahey and Reiss and stated that Zolman had a stable L5 compression fracture. He then recommended a lumbar orthotic because Zolman was reporting discomfort in certain standing and sitting positions. According to Dr. Primack's notes from this initial consultation, Zolman declined a kyphoplasty as a treatment option.

Between May and August 2005, Zolman pursued physical therapy and relied on over-the-counter pain medication. She was seen by Dr. Primack for a follow-up examination on August 2, 2005. Dr. Primack again discussed treatment options for her back pain, which Zolman declined. According to his notes, "[t]he patient does not want to undergo any type of interventional spine injection . . . includ[ing] facet joints, epidural steroid injection, as well as a kyphoplasty."

Thus, when Zolman returned to Dr. Primack for a third visit on August 16, 2005, he determined that she had reached maximum medical improvement (MMI), which in the workers' compensation context refers to the point in time when any impairment from a work injury has become stable and when no further treatment is reasonably expected to improve the condition. *See* § 8–40–201(11.5), C.R.S.2010. Dr. Primack also assessed her permanent impairment rating at twelve percent of the whole person and recommended that she continue with home exercise and over-the-counter pain medication.

Relying on Dr. Primack's findings, Dr. Danahey discharged Zolman from his care on August 18, 2005. On August 30, 2005, Pinnacol filed its final admission of liability (FAL) on the workers' compensation claim.

Zolman challenged Pinnacol's FAL by requesting a division-sponsored independent medical examination (DIME). On December 20, 2005, she was examined by Dr. Kreiger, the physician selected to perform the DIME. He agreed with Dr. Primack that Zolman had reached MMI in August 2005, but found that her permanent impairment rating was sixteen percent of the whole person. Dr. Kreiger did not recommend any post–MMI medical care. On January 19, 2006, Pinnacol amended its FAL to reflect Dr. Kreiger's DIME findings.

At this point, more than one year after she was injured on the job, Zolman sought another medical opinion to supplement the opinions of her three ATPs and the DIME physician. Upon the suggestion of her attorney, Zolman was examined on January 24, 2006, by Dr. Yamamoto, a board-certified physician in family medicine. Dr. Yamamoto diagnosed her with an L5 compression fracture, lumbosacral strain, and depression. He then recommended six types of treatment, including an evaluation for epidural steroid injections or facet injections and a trial of Lidoderm patches.

Dr. Yamamoto's recommendations for post–MMI medical care contrasted significantly with the opinions of the four prior physicians who recommended a post–MMI regimen of home exercise and over-the-counter medication. Accordingly, Zolman requested a workers' compensation hearing to determine (1) whether she was entitled to a change of physicians to Dr. Yamamoto; (2) whether she was entitled to post–MMI medical benefits; and (3) whether she had a permanent total disability. She did not challenge her MMI determination.

## B. Administrative Order

An administrative law judge (ALJ) conducted an extensive evidentiary hearing beginning in April 2006. Over the course of several months, the ALJ received testimony, exhibits, and post-hearing depositions from Drs. Danahey, Primack, and Yamamoto, as well as from Zolman's employers, vocational rehabilitation experts, and Zolman herself. Thereafter, on May 3, 2007, the ALJ issued a lengthy written order denying Zolman's claim for permanent total disability, denying her request for change of physician, and ordering Pinnacol to pay for "reasonable and necessary post MMI maintenance medical treatment including Lidoderm patches." The award of post–MMI medical benefits was "subject to [Pinnacol's] right to contest relatedness, reasonableness, or necessity of any requested medical treatment."

The order was based on the following findings of fact and conclusions of law that are pertinent to this appeal:

- Drs. Danahey, Primack, and Yamamoto each testified that Zolman's compression fracture had healed and that no further treatment was needed to maintain the healed fracture;

- Zolman's inability to work was not causally related to her industrial injuries;

- Zolman did not make a proper showing for a change of physician to Dr. Yamamoto;

- Zolman did not prove by a preponderance of the evidence that Dr. Yamamoto's treatment recommendations would maintain MMI or prevent further deterioration of her condition;

- Dr. Primack disagreed with Dr. Yamamoto's recommendation for an epidural injection because Zolman did not have discogenic pain;

- Dr. Primack disagreed with Dr. Yamamoto's other treatment recommendations, except for the Lidoderm patch; and

- Dr. Primack's opinions concerning post–MMI medical care were found to be credible and persuasive.

The record indicates that Zolman did not appeal the ALJ's May 3, 2007, administrative order.

## C. Medical Opinions After the Administrative Order

Zolman continued with multiple doctor visits after the ALJ's order. On June 5, 2007, she returned to Dr. Primack because Pinnacol scheduled a follow-up examination for her. Even though Zolman told Dr. Primack that she was feeling "no better and no worse," Dr. Primack ordered a CAT scan of the lumbar spine to check the position of the fracture. On June 11, 2007, after reviewing the CAT scan, Dr. Primack concluded that there was no change to Zolman's L5 fracture, that she had "multilevel degenerative disc disease which is independent of her work injury," and that there was no longer "a work-related component to her back pain." Accordingly, he concluded that medication and further follow-up with Zolman would not be needed.

After this visit, on June 25, 2007, Zolman submitted to Pinnacol a written request for a change of physician to Dr. Yamamoto. This request was based on Zolman's allegation that she was entitled to post–MMI maintenance medical care, but that Dr. Primack was refusing to provide her with any further care for her back pain.

Amanda Cooper, a Pinnacol claims representative, investigated Zolman's allegation further. Cooper wrote to Dr. Primack to inquire why he declined to prescribe a Lidoderm patch for Zolman. He replied that, in his medical opinion and based on his recent examination of Zolman, he no longer felt that a Lidoderm patch would be specific to her work injury; that Zolman needed to stop smoking; and that no further treatment other than Zolman performing her home exercise treatment program was necessary at that time. Pinnacol subsequently denied Zolman's change of physician request.

Despite this denial, Zolman returned to Dr. Yamamoto on two occasions, July 27 and August 6, 2007, relying on Medicare benefits to pay for her visits and continued treatment. Dr. Yamamoto assessed Zolman with mechanical low back pain and lumbar strain, in

addition to the closed lumbar fracture. He then recommended a course of ongoing treatment that closely resembled his January 2006 recommendations, including possible epidural steroid injections and facet injections. On August 17, 2007, Zolman again requested a change of physician to Dr. Yamamoto, which was denied.

Consistent with his treatment recommendations, Dr. Yamamoto referred Zolman to Dr. Schwettmann, an anesthesiologist, to evaluate her for epidural steroid injections. On August 20, 2007, Dr. Schwettmann reviewed Zolman's medical history, conducted a physical examination, and ordered a lumbar MRI. Then, on August 24, 2007, based on the MRI results, he treated her with an epidural steroid injection at the L4–L5 position. Zolman reported to Dr. Schwettmann that she experienced substantial relief from her back pain due to the injection. Accordingly, he noted in her file that "[d]ue to the good results she has from this procedure she is a good candidate to repeat the procedure if her pain elevates." Dr. Yamamoto also observed that Zolman's pain level had decreased considerably when he saw her for a follow-up examination on August 27, 2007.

Based on her visits with Drs. Schwettmann and Yamamoto, Zolman repeated her request to Pinnacol for a change of physician on August 30, 2007. This time, Pinnacol responded by authorizing an examination with Dr. Danahey, the initial ATP. Dr. Danahey examined Zolman on September 26, 2007, and concluded as follows: "She is doing very well. No further care or treatment is needed. I am delighted she is doing so well. I do not recommend any change in MMI status or [work] restrictions." Dr. Danahey's examination prompted another change of physician request on November 6, 2007, which was also denied.

### D. Bad Faith Complaint and This Appeal

On February 14, 2008, Zolman filed a complaint in district court alleging that Pinnacol breached its duty of good faith and fair dealing by unreasonably denying and delaying authorization for her medical care. Her complaint covered the entire period of time that had elapsed since her December 3, 2004, injury and highlighted several of the above-mentioned denials of post–MMI care and change of physician requests.

On May 22, 2009, Pinnacol moved for summary judgment on three grounds: (1) Pinnacol's actions in handling Zolman's workers' compensation claim were at least "fairly debatable" because Pinnacol relied on the medical opinions of four physicians, the ALJ's order, and Colorado law; (2) the statute of limitations bars Zolman's claims as to each event occurring prior to February 14, 2006; and (3) the doctrine of issue preclusion applies to all issues resolved in the ALJ order. Zolman responded to the motion by arguing that there were genuine issues of material fact as to the reasonableness of Pinnacol's actions in denying and delaying post–MMI medical care.

On August 5, 2009, the district court granted summary judgment for Pinnacol on the first ground, concluding as follows:

> Even giving [Zolman] the benefit of every doubt and taking her basic allegations as true, the record is devoid of evidence that Pinnacol either acted unreasonably or with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying [Zolman's] claim. Therefore, the Court concludes that, as a matter of law, Pinnacol's actions did not, and indeed could not, constitute bad faith under [Colorado] law.

Given its resolution of the case on the "fairly debatable" issue, the court did not address the other two grounds raised in Pinnacol's motion and dismissed the case with prejudice.

On August 20, 2009, Zolman filed a motion for reconsideration pursuant to C.R.C.P. 59 asking the court to reconsider its summary judgment order. She based her motion in large part on discovery materials obtained from Pinnacol prior to the court's order, which she alleged demonstrated a genuine issue of material fact as to the reasonableness of Pinnacol's conduct. She also pointed to ongoing medical care and correspondence with Pinnacol that postdated the filing of her bad faith complaint.

On September 14, 2009, Zolman filed her initial notice of appeal in this court, which was limited to the district court's summary judgment order. Then, on October 27, 2009, after her C.R.C.P. 59 motion was denied by operation of law, *see* C.R.C.P. 59(j), she filed an amended notice of appeal to include the court's denial of her C.R.C.P. 59 motion. Her amended notice was accepted by this court.

## II.  Motion for Summary Judgment

Zolman contends the district court erred by granting Pinnacol's motion for summary judgment. We disagree.

### A.  Standard of Review

We review an order granting summary judgment de novo. *Geiger v. Am. Standard Ins. Co.,* 192 P.3d 480, 482 (Colo.App.2008). Summary judgment is only appropriate when the pleadings and supporting documents clearly demonstrate that no issues of material fact exist and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo.2008).

The moving party has the initial burden to show the absence of a genuine issue of material fact. *Cont'l Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo.1987). When a party moves for summary judgment on an issue on which that party would not bear the burden of persuasion at trial, his or her initial burden of production may be satisfied by showing the court that there is an absence of evidence in the record to support the non-moving party's case. *Id.* The burden then shifts to the nonmoving party to establish that there is a triable issue of fact. *Id.* at 713. If the nonmoving party fails to do so, the moving party is entitled to summary judgment as a matter of law. *Id.* Courts grant the nonmoving party all favorable inferences that may be drawn from uncontested facts and resolve any doubt as to whether a triable issue of material fact exists against the moving party. *Lombard,* 187 P.3d at 570.

### B.  Applicable Law

Colorado has a well-developed body of appellate case law dealing with insurance bad faith claims.

An insurer must deal in good faith with its insured. *Am. Family Mut. Ins. Co. v. Allen,* 102 P.3d 333, 342 (Colo.2004). "Due to the 'special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort." *Goodson v. Am. Standard Ins. Co.,* 89 P.3d 409, 414 (Colo. 2004) (quoting *Cary v. United of Omaha Life Ins. Co.,* 68 P.3d 462, 466 (Colo.2003)). This tort of bad faith breach of an insurance contract may arise in either a third-party or first-party context, but each context requires proof of a different standard of conduct. *See Allen,* 102 P.3d at 342.

The first-party context, as here, involves a bad faith claim against the insurer for its alleged misconduct with its own insured. *Id.* The insured must prove that (1) the insurer's conduct was unreasonable under the circumstances, and (2) the insurer either knowingly or recklessly disregarded the validity of the insured's claim. *Goodson,* 89 P.3d at 415 (citing *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1275 (Colo.1985)). This standard "reflects a reasonable balance between the right of an insurance carrier to reject a non-compensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim." *Id.* (quoting *Savio,* 706 P.2d at 1275).

In assessing a bad faith claim, the reasonableness of an insurer's conduct is measured objectively based on industry standards. *Allen,* 102 P.3d at 343. Under Colorado law, it is reasonable for an insurer to challenge claims that are "fairly debatable." *See Savio,* 706 P.2d at 1275 (quoting *Anderson v. Cont'l Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978)); *Pham v. State Farm Mut. Auto. Ins. Co.,* 70 P.3d 567, 572 (Colo.App.2003) (affirming summary judgment for insurers on insured's bad faith claim and holding insured's claim was fairly debatable where insurers had a reasonable

belief they were not obligated under the applicable statute to pay UIM benefits during the pendency of a related case); *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 556–57 (Colo.App.1998) (affirming dismissal of insured's bad faith claims because insured's claims for PIP benefits were fairly debatable); *Brandon v. Sterling Colo. Beef Co.*, 827 P.2d 559, 561 (Colo.App.1991) (reversing a jury verdict in favor of an insured and holding as a matter of law that the insurer's actions in appealing an award of workers' compensation benefits to the Industrial Commission and to the Court of Appeals did not constitute bad faith because the insured's claims were fairly debatable and the insurer had reasonably relied on its own experts in pursuing the appeals); *see also Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1216 (2010) (affirming summary judgment for the insurer as a matter of law because the insured failed to show that a reasonable jury could have found that the insurer acted in bad faith). Thus, an insurer will be found to have acted in bad faith only if it has intentionally denied, failed to process, or failed to pay a claim without a reasonable basis. *Savio*, 706 P.2d at 1275; *Brandon*, 827 P.2d at 561. Indeed, even if an insurer possesses a mistaken belief that a claim is not compensable, it may be within the scope of permissible challenge. *Savio*, 706 P.2d at 1275–76; *Brandon*, 827 P.2d at 561.

■ What constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury. However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law. *Bankr. Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 524 (Colo.App.2008).

### C. Analysis

Having reviewed the applicable Colorado law on the tort of bad faith breach of an insurance contract, we turn to Zolman's contention that the district court erred by granting Pinnacol's motion for summary judgment. According to Zolman, the record demonstrates genuine issues of material fact as to the reasonableness of Pinnacol's conduct in handling her requests for post–MMI care and a change of physician. Therefore, Zolman argues, the question of whether Pinnacol can be liable in tort for bad faith should have gone to the jury, and it was error for the court to conclude that "as a matter of law, Pinnacol's actions did not, and indeed could not, constitute bad faith." We disagree.

### 1. Pinnacol's Conduct Prior to the Administrative Order

Although Zolman's complaint and her response to Pinnacol's motion for summary judgment alleged unreasonable conduct by Pinnacol over the entire course of her workers' compensation claim, on appeal, she limits the scope of her bad faith allegations to the following:

Zolman challenges Pinnacol's continued denial of medical care following the award of post–MMI medical care in May 3, 2007, as unreasonable and lacking in good faith.

The medical evidence developed after June 2007, raises a genuine issue of fact regarding Pinnacol's bad faith conduct in continuing to deny Zolman's request for medical care and a change of physician.

Thus, as we read her arguments, she asserts unreasonable conduct by Pinnacol only in the aftermath of the ALJ's order. Accordingly, the issue of whether a jury could find that Pinnacol acted unreasonably before the ALJ's May 3, 2007, order is not before us, and there is no need for us to address it on appeal. *See Moody v. People*, 159 P.3d 611, 614 (Colo.2007) (it is a basic principle of appellate jurisprudence that arguments not advanced on appeal are generally deemed waived).

■ However, we also fail to see how Pinnacol's conduct prior to the ALJ's order, such as Pinnacol's initial denial of the post–MMI treatment recommended by Dr. Yamamoto and Pinnacol's decision not to investigate further Zolman's condition in light of Dr. Yamamoto's medical opinion and testimony, could constitute bad faith. The evidence in the record is uncontroverted that Pinnacol reasonably relied on the medical opinions of four other physicians, including a DIME physician, who concluded that Zolman's injury

did not require the extensive post–MMI treatment recommended by Dr. Yamamoto. Thus, we discern no error in the district court's conclusion that Zolman failed to establish a triable issue of fact as to either prong of a bad faith claim with respect to Pinnacol's actions prior to the ALJ's order. *See Savio,* 706 P.2d at 1275; *see also Sanderson,* 251 P.3d at 1220 (insurer's conduct prior to resolution of insured's lawsuit against tortfeasor does not create a genuine issue of material fact relating to bad faith).

### 2. Pinnacol's Conduct After the Administrative Order

Zolman's arguments on appeal focus on Pinnacol's handling of her claim after the ALJ's order of May 3, 2007. Specifically, she argues that a jury could find that Pinnacol acted unreasonably under the circumstances when (1) Pinnacol did not authorize epidural steroid injections on multiple occasions; (2) Pinnacol did not authorize the minor decompression surgery that Dr. Reiss recommended for leg pain; (3) Pinnacol did not authorize a change of physician to Dr. Yamamoto; (4) Pinnacol continued to rely on the medical opinions of Dr. Primack; and (5) Pinnacol established its Gainsharing program, which is a type of incentive compensation plan for Pinnacol employees. Based on our review of the entire record presented to the district court in connection with the motion for summary judgment, we conclude the court correctly ruled that there are no genuine issues of material fact as to the reasonableness of Pinnacol's conduct regarding any of these matters.

As to the epidural steroid injections, the record shows that Zolman initially declined any type of spine injection when she was seen by Dr. Primack in August 2005, but that she agreed to try an epidural steroid injection based on Dr. Yamamoto's recommendation in August 2007. According to Drs. Yamamoto and Schwettmann, the injection that Zolman received on August 24, 2007, provided her with substantial relief from her back pain. She received additional injections from Dr. Schwettmann in June 2008 and May 2009, which provided her with similar relief. However, relying on Drs. Primack and Dana-

hey and on the full medical history of Zolman's claim, Pinnacol declined to authorize any injections as part of her post–MMI care.

■ That one physician (Dr. Yamamoto) determined that the injection was appropriate treatment and other physicians (Drs. Primack and Danahey) consistently determined that Zolman's work injury required no further treatment demonstrates, in our view, that Zolman's claim for post–MMI epidural steroid injections was at least fairly debatable and that Pinnacol did not act unreasonably in declining to authorize such injections. Although not necessarily conclusive as a matter of claim preclusion, Pinnacol could also reasonably consider, as part of the information available to it, the ALJ's finding of fact that "Dr. Primack's opinions concerning post MMI maintenance medical treatment are . . . credible and persuasive." Zolman argues that Dr. Reiss concluded in July 2008 that the back and leg pain Zolman was experiencing at that time was caused by her work injury, and therefore, Dr. Reiss's report shows that Pinnacol may have acted unreasonably by denying her the injections. However, it is not at all clear from the very brief reference in his report that Dr. Reiss so concluded, rather than simply reporting on what Zolman had told him. In any event, Pinnacol could still have reasonably relied on the consistent medical opinions of Drs. Primack and Danahey that Zolman did not require steroid injections as ongoing treatment for her work injury.

We disagree with Zolman's assertion that multiple physicians agreed that her work injury required ongoing medical care. Although Dr. Schwettmann gave her the injection and monitored her response to it, he never independently determined that her work injury required the injection as post–MMI treatment. He merely treated her back pain based on Dr. Yamamoto's referral. Likewise, Dr. Reiss, who did not reexamine Zolman until five months after she filed her complaint, did not independently suggest further treatment for her back pain and even cautioned against "some sort of fusion" for her back pain "considering she has several levels of degeneration." Only Dr. Yamamoto

assessed a need for ongoing steroid injection treatment for her work injury.

We also reject Zolman's reliance on *Fera v. Industrial Claim Appeals Office,* 169 P.3d 231 (Colo.App.2007), for the proposition that summary judgment is not proper where there are conflicting medical opinions. As Pinnacol correctly observes, *Fera* is distinguishable from this case because it was an appeal regarding penalties in a workers' compensation case, and as such, it made no mention at all of the legal standards governing a bad faith claim. Moreover, *Fera* is factually dissimilar because there the insurer relied on the opinion of its own physician advisor to the exclusion of the opinions of the claimant's ATP and two independent physicians. Here, by contrast, Zolman's ATPs did not recommend steroid injections for post–MMI treatment.

Nor are we persuaded by Zolman's argument that Pinnacol simply summarily denied authorization for further injections without conducting any investigation. For example, Pinnacol's response to the May 13, 2009 request by Zolman's lawyer for authorization of further steroid injections by Dr. Schwettmann indicates that Pinnacol reviewed all of the medical records in the case, including the more recent reports in 2008 and 2009 by Drs. Schwettmann and Reiss. Further, Pinnacol offered to schedule and pay for another appointment with ATP Dr. Primack to have him evaluate Zolman "again to determine whether an epidural steroid injection is reasonable, necessary and related to her work injury." However, Zolman chose not to schedule such an appointment.

Therefore, because Zolman's claim for post–MMI injections was fairly debatable, we conclude that it was reasonable for Pinnacol to challenge it as a matter of law. *See Savio,* 706 P.2d at 1275; *Brandon,* 827 P.2d at 561.

As to the minor decompression surgery referenced by Dr. Reiss in his July 2008 report as a possible treatment option for Zolman's leg pain, contrary to Zolman's statement in her opening brief, nothing in the record shows she ever requested that Pinnacol authorize such treatment by Dr. Reiss. Indeed, the August 8, 2008 letter from Zolman's counsel to Pinnacol following Zolman's visit to Dr. Reiss merely summarizes Dr. Reiss's report of Zolman's visit and states that Zolman "may want to pursue the minor decompression" procedure in the future, but does not request authorization from Pinnacol for this treatment option. Further, in the May 13, 2009 letter to Pinnacol requesting authorization for injections by Dr. Schwettmann, Zolman's counsel expressly states that Zolman preferred to avoid the surgical options referenced by Dr. Reiss in his July 2008 report.

██ As to Zolman's requests for a change of physician, we also conclude these requests were fairly debatable as a matter of law. The record indicates that Zolman requested a change to Dr. Yamamoto on four occasions between the ALJ's order and the filing of her complaint. Each time, she based her request on Dr. Yamamoto's willingness to provide her with extensive post–MMI care, including epidural steroid injections. However, the ALJ had already made specific findings of fact that Zolman was not entitled to a physician change and that Dr. Primack's opinions rejecting post–MMI care were credible and persuasive. Zolman's repeated requests were therefore fairly debatable, and we conclude that Pinnacol acted reasonably as a matter of law when it refused to authorize a change after May 2007.

Our conclusion as to Zolman's requests for a change of physician is further supported by the undisputed fact that on at least three occasions, Pinnacol did not immediately decline her request. Rather, Pinnacol investigated Zolman's allegations, such as when Pinnacol followed up with Dr. Primack regarding the Lidoderm patch and when Pinnacol authorized another examination with Dr. Danahey in September 2007 to consider further treatment. Indeed, after the September 2007 visit, Dr. Danahey discharged Zolman from medical care, concluding that "no further care or treatment is needed." Further, Pinnacol's May 2009 letter denying Zolman's most recent request for a change of treating physician to Dr. Schwettmann indicates Pinnacol's decision was based on a review of all of the medical records in the case. Thus, contrary to Zolman's arguments, Pinnacol did not ignore the opinions of other

doctors or "blindly deny medical benefits, and Zolman's request for a change of physician." Instead, Pinnacol considered each request to change to Dr. Yamamoto or Dr. Schwettmann prior to denying it based on her medical history, the ALJ's order, and the contrary opinions of Zolman's ATPs.

■ We reject Zolman's argument that the deposition testimony of Pinnacol's claim representative, Amanda Cooper, somehow created a genuine issue of material fact as to the fair debatability of Pinnacol's actions. To the contrary, in the context of the long history of Zolman's claim, we perceive nothing in Cooper's testimony that would allow a jury to conclude Pinnacol acted in bad faith, as defined under well-established Colorado law. Nor do we discern anything in the affidavit and report of Zolman's expert, Everett Lee Herndon, Jr., that created an issue of material fact regarding whether Zolman's claims and requests were fairly debatable. First, the mere existence of Herndon's report does not raise an issue of material fact, precluding summary judgment. *See Bankr. Estate of Morris*, 192 P.3d at 528 ("[w]e ... reject [claimant's] assertion that the affidavit from her expert creates a genuine issue of material fact"). Moreover, Herndon's affidavit and report simply state his conclusory opinions that Pinnacol acted in bad faith without establishing any genuine issue of material fact.

Zolman further argues that a jury could find that Pinnacol's continued reliance on Dr. Primack's opinions to deny post–MMI care was unreasonable in light of alleged inconsistencies in his medical opinions. We reject this argument because we agree with Pinnacol that Zolman failed to show that Dr. Primack's opinions as to the need for an epidural steroid injection or a Lidoderm patch were truly contradictory. We also note that the Lidoderm issue was essentially mooted when Zolman stated in her deposition that she had an allergic reaction to a Lidoderm patch she obtained from a relative.

■ Finally, we disagree with Zolman's argument that a jury could find Pinnacol acted unreasonably when it established its Gainsharing program. Zolman relies on the opinions of her expert, Herndon, to criticize the Gainsharing program and to argue that the program caused Pinnacol's adjusters to focus solely on profit. But by Herndon's own admissions, he did not know exactly how Pinnacol implemented the Gainsharing program. Nor did he state that any action taken on Zolman's claim affected the bonus of the claim representative, Cooper, or any other Pinnacol employee.

■ In sum, Zolman failed to establish a genuine issue of material fact as to the reasonableness of Pinnacol's conduct following the ALJ's order. Despite Zolman's allegations of unreasonableness, we agree with the district court that her claim for post–MMI care and a change of physician was at a minimum fairly debatable. "[I]n appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Bankr. Estate of Morris, Id.* at 524. Accordingly, we conclude that Pinnacol was entitled to judgment as matter of law that it did not act in bad faith in handling Zolman's workers' compensation claim. The court properly granted Pinnacol's motion for summary judgment.

### 3. Reliance on Out–of–State Legal Authority

As discussed above, the law governing first-party bad faith breach of an insurance contract is well-developed in Colorado. Notwithstanding this body of law, Zolman relies substantially on out-of-state and federal authority to support her argument that there is a triable issue of fact to preclude summary judgment for Pinnacol. In our view, Zolman's reliance on other authority is unnecessary, given existing Colorado case law, and is largely misplaced.

Zolman relies extensively on two Arizona cases in her effort to raise a fact issue as to the reasonableness of Pinnacol's conduct. She relies on *Zilisch v. State Farm Mutual Automobile Insurance Co.*, 196 Ariz. 234, 995 P.2d 276 (2000), for the proposition that a jury should decide the reasonableness of an insurer's conduct when the insurer challenges an insured's fairly debatable claim without adequately investigating or evaluat-

ing the claim. However, the record here does not show that Pinnacol failed to investigate or inappropriately evaluated Zolman's claim. To the contrary, the record shows Pinnacol responded to Zolman's requests for post–MMI care by ordering follow-up examinations with her ATPs, and it relied on four medical opinions and the ALJ's order when evaluating her claim. Under such circumstances, divisions of this court have consistently held that insurers acted reasonably and were entitled to judgment as a matter of law. *See Sanderson,* 251 P.3d at 1216; *Pham,* 70 P.3d at 572–74; *Brennan,* 961 P.2d at 556–57; *Brandon,* 827 P.2d at 560–61. Furthermore, *Zilisch* is distinguishable on its facts because there, the permanency of the insured's injury was undisputed, whereas here, that issue was disputed and eventually decided against Zolman by the ALJ.

Zolman also relies on an earlier Arizona case, *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986), to argue that an insurer may act in bad faith when it does not give "equal consideration to the insured's interests." *Id.* at 572. However, the "equal consideration" standard only applies in third-party bad faith cases, not first-party cases. *See Am. Guar. & Liab. Ins. Co. v. King,* 97 P.3d 161, 169 (Colo.App.2003). Further, *Rawlings* is also factually distinguishable. Unlike the situation in *Rawlings,* Pinnacol did not engage in a course of deceitful conduct to impede Zolman's claim. Indeed, the record shows that Pinnacol carefully considered, rather than ignored, her requests for post–MMI care and change of physician. Thus, while the reasonableness of an insured's conduct may be a jury question in cases like *Zilisch* and *Rawlings,* when the record shows proper claim handling by an insurer and the facts as to fair debatability are undisputed, reasonableness may be decided as a matter of law.

Zolman also relies on Ninth Circuit authority to assert that the reasonableness of Pinnacol's conduct was a jury question. While in *Amadeo v. Principal Mutual Life Insurance Co.,* 290 F.3d 1152 (9th Cir.2002), the court found there was sufficient evidence from which a jury could conclude that the insurer failed to investigate the insured's claim at all, the record in this case shows

otherwise, and, thus, the reasonableness of Pinnacol's conduct was properly decided as a matter of law. And while in *Hangarter v. Provident Life & Accident Insurance Co.,* 373 F.3d 998 (9th Cir.2004), the evidence showed a biased investigation that called into question the reasonableness of the insurer's denial of a claim, the record here does not show bias as discussed more fully below.

Further, we note that there are a number of other out-of-state cases where the courts ruled that an insured's bad faith claim was properly decided as a matter of law because the record showed (as it does here) a fairly debatable claim and reasonable claim-handling conduct by the insurer. *See LeRette v. Am. Med. Sec., Inc.,* 270 Neb. 545, 705 N.W.2d 41, 49–51 (2005) (reversing a jury verdict finding bad faith where insurer had an arguable basis, rooted in medical opinions, to deny the insured's claim); *Cortez v. Liberty Mut. Fire Ins. Co.,* 885 S.W.2d 466, 469–70 (Tex.App.1994) (where there is uncontroverted evidence of a reasonable basis for terminating benefits, such as an independent medical evaluation, a bad faith claim is properly defeated as a matter of law); *Prince v. Bear River Mut. Ins. Co.,* 56 P.3d 524, 535 (Utah 2002) (where validity of claim for benefits is fairly debatable due to a medical report, denial of the claim cannot be bad faith as a matter of law and summary judgment is proper).

Because we are able to address Zolman's contentions in the context of well-developed Colorado law on the tort of insurance bad faith, we need not rely on Zolman's cited cases from other jurisdictions. In any event, because those cases are distinguishable on their facts, they do not compel us to alter our conclusion that the district court properly granted summary judgment for Pinnacol on Zolman's bad faith claim.

### III. C.R.C.P. 59 Motion

Zolman contends the district court erred by denying her motion for reconsideration pursuant to C.R.C.P. 59. We disagree.

### A. Standard of Review

■ A motion to reconsider a summary judgment order, as here, is properly charac-

terized as a motion for new trial under C.R.C.P. 59(d)(4). *Graven v. Vail Assocs., Inc.,* 888 P.2d 310, 316 (Colo.App.1994), *rev'd on other grounds,* 909 P.2d 514 (Colo.1996).

Under C.R.C.P. 59(d)(4), a new trial may be granted on the ground of "[n]ewly discovered evidence, material for the party making the application which that party could not, with reasonable diligence, have discovered and produced at the trial." Consistent with the text of this rule, the supreme court has adopted the following three-part test for resolving a motion for a new trial based on newly discovered evidence:

> [F]irst, the applicant must establish that the evidence could not have been discovered by the exercise of reasonable diligence and produced at the first trial; second, it must be shown that the evidence was material to an issue in the first trial; and third, the applicant must establish that the evidence, if admitted, would probably change the result of the first trial.

*Aspen Skiing Co. v. Peer,* 804 P.2d 166, 172 (Colo.1991).

■ A trial court has considerable discretion in ruling on a motion for new trial, and its ruling will not be disturbed absent a clear showing of an abuse of discretion. *Id.*

### B. Analysis

After the court granted summary judgment for Pinnacol on August 5, 2009, Zolman filed a C.R.C.P. 59 motion asking the court to reconsider its order in light of allegedly new, material evidence that was not produced until July 30, 2009. The court did not rule on her motion within the sixty-day period prescribed by C.R.C.P. 59, and therefore, it was deemed denied by operation of law. *See* C.R.C.P. 59(j). On appeal, Zolman contends the court erred by denying her C.R.C.P. 59 motion. Because we conclude that the evidence offered would probably not change the result, we perceive no error.

■ First, Zolman asserts that she provided substantial evidence of Dr. Primack's financial bias and that this evidence raises a genuine dispute as to the reasonableness of Pinnacol's reliance on his medical opinions. However, in our view, the evidence

that Zolman offers hardly demonstrates financial bias on the part of Dr. Primack. The brochure from Dr. Primack's clinic does not suggest an improper professional relationship with Pinnacol. And the written correspondence between Dr. Primack and Pinnacol suggests a deteriorating relationship between those parties, not, as characterized by Zolman, Dr. Primack's "greater loyalty to Pinnacol" or a "long established, profit-driven business relationship." Furthermore, there is no dispute that Horizon, not Pinnacol, sent Zolman to Concentra for her work injury, and that it was Concentra, not Pinnacol, that assigned Zolman to Dr. Danahey, who then made the referral to Dr. Primack. There is no indication in the record that Pinnacol selected Dr. Primack or influenced Dr. Danahey's referral to Dr. Primack. *Cf. Hangarter,* 373 F.3d at 1010 (one factor that may show an insurer's bias is if the insurer dishonestly selected its experts).

■ Second, Zolman argues that the evidence of Pinnacol's "reserves and settlement screens placing a value on her case of approximately $226,000," when Pinnacol only offered at most $18,000 to settle her case, raises a genuine dispute as to the reasonableness of Pinnacol's claim-handling conduct. We reject this assertion because, although Pinnacol may have set aside certain funds to cover Zolman's claim, it was not required to use the entirety of those funds, especially when Pinnacol relied on four physicians and the ALJ's order to make its decisions. *See Silva v. Basin W., Inc.,* 47 P.3d 1184, 1190 (Colo.2002) ("Neither reserves nor settlement authority reflect an admission by the insurance company that a claim is worth a particular amount of money.").

Neither the evidence relating to Dr. Primack nor the evidence of Pinnacol's reserves raises a triable issue as to the reasonableness of Pinnacol's conduct sufficient to "probably change the result" and warrant reversal of the summary judgment order. Accordingly, we conclude that the district court did not abuse its discretion in denying Zolman relief under C.R.C.P. 59.

We decline to address the arguments in Zolman's C.R.C.P. 59 motion that have not been reasserted on appeal because they are deemed waived. *See Moody,* 159 P.3d at 614.

The judgment and order are affirmed.

Judge CASEBOLT and Judge MÁRQUEZ concur.*

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2010.