24CA0954 McCurdy v Copart 05-29-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0954
Adams County District Court No. 21CV31133
Honorable Sarah E. Stout, Judge

---

Courtney McCurdy,

Plaintiff-Appellee,

v.

Copart, Inc.,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 29, 2025

---

Ramos Law, Matthew R. Osborne, Northglenn, Colorado; Jennifer Mrachek, Golden, Colorado, for Plaintiff-Appellee

Brown Gren Abraham & McCracken, LLC, Joshua D. Brown, Andrew J. Royer, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Copart, Inc., appeals the judgment in favor of plaintiff, Courtney McCurdy, for fraudulent nondisclosure or concealment[1] and violating the Colorado Consumer Protection Act (CCPA). We affirm in part, reverse in part, and remand to the trial court for further proceedings.

## I.     Background

### A.     McCurdy's Injury

¶ 2     McCurdy's claims in this case stem from her purchase of a trailer that had previously been damaged in an accident in Michigan. After the accident, Auto Club Insurance Association (AAA)[2] declared the trailer a "total loss," paid out an insurance claim to the owner for the full value of the of the trailer, and took possession of it.

---

[1] As a shorthand, throughout this opinion, we refer to this claim as "fraudulent nondisclosure."

[2] According to the second amended complaint, Auto Club Insurance Association (ACIA) sells insurance in Michigan, and CSAA General Insurance Company (CSAA) is a sister company of ACIA that sells insurance policies in Colorado. ACIA and CSAA both "fall under the AAA umbrella of companies" and "use the AAA logo on communications to third parties." Based on this and because the distinction between these two entities isn't material to this appeal, we refer to them both as AAA throughout this opinion.

¶ 3       Copart is an auction marketplace that remarkets and consigns vehicles.  Copart has an agreement with AAA giving it the right to sell "totaled out" vehicles for AAA.  Depending on the contract, Copart also handles titling for the seller.  As part of its contract with AAA, Copart agreed to title the trailer, but Copart never owned the trailer.

¶ 4       After AAA took possession of the trailer, it told Copart to "brand [the trailer] per state guidelines."  Then, AAA sold the trailer through a Copart auction to Lakewood RV, a company located in Missouri.  The auction disclosed "primary damage to the top roof and secondary minor dent damage."

¶ 5       After receiving the trailer, Lakewood RV inspected it and decided to resell the trailer through a Copart auction.  This time the auction listed the trailer as having damage to the "top roof."  The winning bidder at the auction was Mac Scooters.  But Mac Scooters quickly had the transaction reversed complaining of "unlisted damage of the undercarriage [or] frame making it unable to be [pulled]."

¶ 6       The trailer was then sold again through another Copart auction to APB Motors, a company located in Colorado.  This time

Copart disclosed "top roof" and "frame damage." APB Motors brought the trailer to Colorado.

¶ 7 After receiving the trailer, APB Motors inspected it and found "too much damage that was not visible initially," so it consigned or sold the trailer in another Copart auction to RV Trailers of America, a company located in Colorado. The consignment agreement and auction listed frame damage. But RV Trailers of America made the decision to again sell the trailer through yet another Copart auction. This time Scarpa Motors, a company located in Colorado, was the winning bidder. The auction at which Scarpa Motors acquired the trailer listed it only as having "minor dents and scratches."

¶ 8 Each time the trailer was sold with a clean title and "as-is," "as where is," without any warranties. Scarpa eventually sold the trailer to McCurdy. Copart wasn't directly involved in the sale of the trailer to McCurdy.

¶ 9 When McCurdy and her husband (collectively, the McCurdys), first used the trailer, they noticed that the "tires were rubbing on the underside of the wheel well." The McCurdys took the trailer back to Scarpa and agreed with Scarpa to split the cost of repairs.

¶ 10 After Scarpa made repairs to the trailer, the McCurdys took the trailer out again, this time over Monarch Pass. McCurdy's husband was driving, and he later testified that, at the bottom of the pass, "it felt like the brakes were either hot or locked up or something wasn't right." McCurdy's husband couldn't find a place to pull over, so he had to keep driving and noticed that "the tire started smoking." Eventually, he found a place to pull over on the side of a two-lane stretch of Highway 50 that was "about [thirty] miles from Monarch Pass." McCurdy's husband testified that where he pulled off "was actually an embankment that sloped down so the trailer was leaning to the side." According to McCurdy's husband, he saw that "the tires from the axles were rubbing together and that's what was causing the smoke." The McCurdys didn't have cell phone service where they had stopped, so they had to keep driving until they reached a gas station to call for a tow. The McCurdys also contacted their insurance company, AAA, to file a claim, but the claim was never paid because "the trailer was already totaled." The McCurdys placed the trailer in storage and didn't drive it again or repair it.

## B. Procedural History

¶ 11 McCurdy initially filed suit against Scarpa, APB Motors, and RV Trailers of America. She then amended her complaint to include Copart and AAA. APB Motors wasn't a listed defendant in the first amended complaint and the claims against it were eventually dismissed. McCurdy then filed a second amended complaint bringing claims against Copart for (1) fraudulent nondisclosure for auctioning the trailer with a clean title and misrepresenting the frame damage and (2) violations of the CCPA for failing to apply for a salvage title and misrepresenting the damages to the trailer. The claims against Scarpa and AAA were eventually settled.

¶ 12 RV Trailers of America and Copart filed separate motions for summary judgment. In its motion, Copart requested the entry of judgment on both the fraudulent nondisclosure and CCPA claims. In an order addressing both motions, the court granted summary judgment in favor of RV Trailers of America, dismissing the claims against it, and partially granted summary judgment in favor of Copart, finding that McCurdy couldn't prevail on a fraudulent nondisclosure claim for the frame damage against Copart.

¶ 13     The surviving claims against Copart proceeded to trial.  After a four-day trial, the jury found in favor of McCurdy and against Copart on both the fraudulent nondisclosure and CCPA claims.  The jury awarded her a total of $700,000 in economic and noneconomic damages.  The jury also found by clear and convincing evidence that Copart had acted in bad faith.

¶ 14     After trial, McCurdy requested the court treble the awarded damages because the jury had found that Copart violated the CCPA and acted in bad faith.  In addition to objecting to McCurdy's motion, Copart filed a motion for a new trial on the grounds that there were irregularities in the jury instructions, the damages were excessive, and the court erred by failing to require the jury to delineate damages between the two claims on the verdict form.  The trial court denied Copart's motion for a new trial and entered an amended order of judgment.  In the amended order of judgment, the court amended the damages, ruling as follows:

> Judgment is hereby entered in favor of [McCurdy] in the amount of $2,002,920.84. This is calculated based on the $700,000 in damages awarded by the jury and reflects both the imposition of the noneconomic cap as required by [section] 13-21-102.5(3)(a)[, C.R.S.

6

2024,] and the mandatory trebling as required by [section] 6-1-113(2)(a)(III)[, C.R.S. 2024].

¶ 15    While the amended judgment didn't explain the trial court's calculation of damages, in its order denying Copart's motion for a new trial, the trial court explained that the verdict had to be amended to reflect "$53,880.28 in economic damages as supported by the evidence plus the noneconomic statutory cap of $613,760.00," which was then subject to "the mandatory trebling as required by [section] 6-1-113(2)(a)(III)."

## II.    Analysis

¶ 16    On appeal, Copart contends that the trial court erred by (1) denying its motion for summary judgment; (2) denying its motion for directed verdict on McCurdy's fraudulent nondisclosure and CCPA claims; (3) denying its motion for a new trial based on irregularities in the jury instructions and excessive damages; and (4) trebling the entire $667,640.28 damages award after failing to

require the jury to delineate damages on the verdict form.[3] We address each contention in turn below.

### A. Motion for Summary Judgment

¶ 17 Copart contends that the trial court erred by denying its motion for summary judgment. As part of this contention, Copart argues that McCurdy didn't have standing to bring the case against it. We aren't persuaded.

### 1. Additional Background

¶ 18 Before trial, Copart filed a motion for summary judgment arguing that McCurdy didn't have standing to bring the fraudulent nondisclosure or CCPA claim, that the fraudulent nondisclosure claim should fail as a matter of law, and that McCurdy couldn't prove her CCPA claim. The trial court granted the motion in part,

---

[3] McCurdy's request for an award of attorney fees remains pending before the trial court. In addition to the other issues it raises on appeal, Copart also contends that we should "make [a] finding" that the still-pending motion for attorney fees is or has been denied. For reasons we explain *infra* Part II.E, we decline to address any matters related to attorney fees, as those issues aren't properly before us. But also we note that the pending but unresolved motion for attorney fees doesn't affect the finality of the judgment or our jurisdiction over the other issues raised on appeal. *See L.H.M. Corp., TCD v. Martinez*, 2021 CO 78, ¶ 30 ("[A] judgment on the merits is final and appealable notwithstanding an unresolved issue of attorney fees.").

concluding that the fraudulent nondisclosure claim based on the trailer's frame damage must be dismissed.  The trial court denied summary judgment on the fraudulent nondisclosure claim as to title and the CCPA claim.

### 2.   Standard of Review and Legal Principles

¶ 19    We review a trial court's *grant* of summary judgment de novo and apply the same standard as the trial court.  *S. Cross Ranches, LLC v. JBC Agric. Mgmt., LLC*, 2019 COA 58, ¶ 11; *CadleRock Joint Venture LP v. Esperanza Architecture & Consulting, Inc.*, 2021 COA 119, ¶ 9.  But "[a] denial of a motion for summary judgment is not a final determination on the merits and, therefore, is not an appealable order."  *Tisch v. Tisch*, 2019 COA 41, ¶ 47 (alteration in original) (quoting *Karg v. Mitchek*, 983 P.2d 21, 25 (Colo. App. 1998)).  Further, the denial of a motion for summary judgment isn't appealable after a final judgment.  *Id.*  Thus, "to preserve an issue raised in a denied motion for summary judgment, a party must raise the issue in a motion for a directed verdict or judgment notwithstanding the verdict."  *Id.* at ¶ 48.  Notwithstanding these principles, standing "is a jurisdictional issue which can be raised at

9

any stage of an action, including the appeal." *Bennett v. Bd. of Trs. for Univ. of N. Colo.*, 782 P.2d 1214, 1216 (Colo. App. 1989).

¶ 20    Because Copart can't appeal the trial court's denial of summary judgment, we decline to address whether the trial court erred by denying summary judgment on any issues raised other than standing.  But we do address whether McCurdy had standing to bring the fraudulent nondisclosure and CCPA claims against Copart.  We conclude that she did.

### 3.    Standing

¶ 21    To establish standing in Colorado, a plaintiff "must have (1) suffered an injury in fact (2) to a legally protected interest." *Roane v. Elizabeth Sch. Dist.*, 2024 COA 59, ¶ 25.

¶ 22    According to Copart, McCurdy lacked standing to bring the fraudulent nondisclosure and CCPA claims against it because she didn't have a legally protected interest related to Copart.  Recall, Copart never owned the trailer, had any contact with McCurdy, or made any representations to her, and it ultimately facilitated the final sale of the trailer to Scarpa (not McCurdy).  Copart contends that this lack of privity between Copart and McCurdy, as well as the existence of an "as-is" exculpatory clause in Copart's "Member

10

Terms and Conditions," deprived McCurdy of any legally protected interest that could give rise to a claim by her against Copart. We address both contentions separately.

a.    Privity

¶ 23    First, we address Copart's contention that McCurdy didn't have a legally protected interest because she lacked privity with Copart. That she lacked privity with Copart is of no moment. In certain cases, lack of privity of contract "may not be used as a shield." *Schnell v. Gustafson*, 638 P.2d 850, 852 (Colo. App. 1981). For example, when a homeowner fails to disclose a latent defect that "in equity and good conscience (they) should have disclosed," the homeowner isn't insulated from liability to a later purchaser of the home. *Id.* at 851-52 (alteration in original) (quoting *Morrison v. Goodspeed*, 68 P.2d 458, 477 (Colo. 1937)). Copart's failure to disclose the salvage title is similar to a homeowner's failure to disclose a latent defect, and, therefore, privity isn't required for the fraudulent nondisclosure claim.

¶ 24    We also reject the contention that privity is required for a plaintiff to advance a CCPA claim. Indeed, an action under the CCPA is available to, among others, "any person" who "[i]s any

11

successor in interest to an actual consumer who purchased the defendant's goods, services, or property." § 6-1-113(1)(b).

¶ 25   We acknowledge that the evidence presented at trial appears to establish that Copart never took ownership of the trailer. But ownership isn't required for standing to bring the fraudulent nondisclosure or CCPA claim. Rather, for the fraudulent nondisclosure claim, McCurdy had to demonstrate only that Copart had a duty to disclose the salvage title, that it breached that duty, and that the breach of that duty caused her to suffer damages. *See Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) ("To succeed on a claim for fraudulent concealment or non-disclosure, a plaintiff must show that the defendant had a duty to disclose material information."). The evidence supported that Copart had this duty.

¶ 26   With respect to the CCPA claim, all that McCurdy had to demonstrate to establish standing was that she was a successor in interest to an actual consumer of Copart's services. *See* § 6-1-113(1)(b). Because the evidence demonstrates that Scarpa used Copart's services to purchase the trailer, McCurdy has standing for the CCPA claim even though Copart never owned the trailer.

### b. Exculpatory Clause

¶ 27    We next address Copart's contention that McCurdy didn't have a legally protected interest because Copart's listing agreement included an exculpatory clause and "as-is" provision. These provisions don't affect McCurdy's standing to assert either claim. To begin, McCurdy didn't contract with Copart; therefore, any exculpatory or "as-is" clause included in its contract with Scarpa doesn't impair her standing to sue Copart. *Cf. E. Meadows Co. v. Greely Irrigation Co.*, 66 P.3d 214, 217 (Colo. App. 2003) ("The general rule is that one who is not a party to a contract, and from whom no consideration moved, has no connection therewith. He can avail himself of its terms neither as a cause of action nor a defense." (quoting *Cont'l Cas. Co. v. Carver*, 14 P.2d 181, 183 (Colo. 1932))). Moreover, "[m]ost courts will not enforce exculpatory and limiting provisions . . . if they purport to relieve parties from their own willful, wanton, reckless, or intentional conduct." *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008). And McCurdy's allegation in her second amended complaint was that Copart "acted intentionally in [its] fraudulent non-disclosure" and that it "knowingly or recklessly violated the CCPA."

13

¶ 28    Accordingly, we conclude that McCurdy had standing to bring both the fraudulent nondisclosure and CCPA claims against Copart.

## B.    Motion for Directed Verdict

¶ 29    Copart next contends that the trial court erred by denying its motion for directed verdict on both the fraudulent nondisclosure and CCPA claims. We aren't persuaded that the trial court erred by denying the motion for directed verdict regarding the fraudulent nondisclosure claim but agree that the trial court erred by denying the motion regarding the CCPA claim.

### 1.    Additional Facts

¶ 30    Following the close of McCurdy's case, Copart orally argued its motion for directed verdict. Specifically, for the fraudulent nondisclosure claim, Copart's counsel asserted that McCurdy had presented insufficient evidence to show an "[i]ntent to commit fraud on actual or potential buyers" or a link between the alleged fraud and the negative impact alleged. And, for the CCPA claim, Copart's counsel asserted that she presented insufficient evidence to show a significant public impact because, among other things, (1) Copart's auctions are private (only available to Copart members); (2) the consumers in this case were all sophisticated dealers; (3) there was

14

no evidence of a disparity of bargaining power between Copart and its member-customers; (4) there was no evidence that Copart had engaged in similar misrepresentations in the past; (5) there was no evidence of prior or future public impact; and (6) McCurdy wasn't a Copart consumer.

### 2. Legal Principles and Standard of Review

¶ 31    Pursuant to C.R.C.P. 50, "[a] party may move for a directed verdict at the close of the evidence offered by an opponent or at the close of all the evidence." A motion for directed verdict is only granted "if the evidence, considered in the light most favorable to the nonmoving party, 'compels the conclusion that reasonable persons could not disagree and that no evidence, or legitimate inference therefrom, has been presented upon which a jury's verdict against the moving party could be sustained.'" *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 25 (quoting *Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325, 328 (Colo. App. 1992)).

¶ 32    We review a trial court's denial of a motion for directed verdict de novo. *Parks v. Edward Dale Parrish LLC*, 2019 COA 19, ¶ 9. We assess whether the trial court's directed verdict ruling is supported by "evidence of sufficient probative force," and, like the trial court,

we must "consider all the facts in the light most favorable to the nonmoving party and determine whether a reasonable jury could have found in favor of the nonmoving party." *State Farm*, ¶ 26.

### 3. Fraudulent Nondisclosure

¶ 33 Copart contends that there was insufficient evidence to support the fraudulent nondisclosure claim because, at trial, McCurdy "presented no evidence to support or imply any purposeful intent on [the] part of [Copart] to create a false impression on her." We disagree.

¶ 34 At trial, the court properly instructed the jury on the elements of fraudulent nondisclosure as follows:

> For the plaintiff, Courtney McCurdy, to recover from the Defendant, Copart, Inc., on her claim of fraudulent nondisclosure or concealment of the salvage title, you must find all of the following have been proved by a preponderance of the evidence:
>
> 1. Copart had a duty to title the vehicle as salvage and should have disclosed it as such, but instead reported it as a clean title;
>
> 2. This fact was material;
>
> 3. The Defendant, Copart, Inc., failed to disclose it with the intent of creating a false impression of the actual facts in the mind of the auction buyers;

4. The Defendant, Copart, Inc., failed to disclose the fact with the intent that the auction buyers take a course of action they might not take if they knew the actual facts;

5. The non-disclosed fact was repeated to [McCurdy] by Scarpa Motors;

6. [McCurdy] took such action or decided not to act relying on the assumption that the undisclosed fact did not exist or was different from what it actually was;

7. [McCurdy's] reliance was justified; and

8. This reliance caused damages and losses to [McCurdy].

See COLJI-Civ. 19:2 (2025) (first citing *Baker v. Wood, Ris & Hames, Pro. Corp.*, 2016 CO 5, ¶ 59; and then citing *Anson v. Trujillo*, 56 P.3d 114, 120 (Colo. App. 2002)).

¶ 35     The question of whether the trial court erred in denying the motion for directed verdict on the fraudulent nondisclosure claim turns on whether there was sufficient evidence presented from which a reasonable juror could find that Copart failed to disclose a material fact "with the intent of creating a false impression of the actual facts in the mind of the auction buyers." While we agree that there was no *direct* evidence of Copart's intent to create a false

17

impression upon buyers, we disagree that McCurdy didn't present sufficient evidence at trial to support the jury's verdict.

¶ 36 McCurdy presented circumstantial evidence of Copart's intent to deceive. First, there was evidence — albeit conflicting — that Copart had a financial motive to list the vehicle with a clean title, supporting an inference that it intentionally mistitled the trailer. The manner in which Copart described the trailer — and how that description changed over time — was also circumstantial evidence that it intended to mislead potential purchasers, including with respect to its title.

¶ 37 Specifically, evidence presented at trial showed that Copart became less forthcoming in how it described the condition of the trailer with each subsequent auction, even though it had more information regarding its poor condition. Indeed, by the time of the auction where Scarpa Motors was the successful bidder, Copart was listing the trailer as only suffering from "minor dents and scratches." This more favorable (and less forthcoming) description was provided *after* previous purchasers had complained to Copart of the trailer's extensive frame damage. While the fraudulent nondisclosure of the frame damage was dismissed before trial, the

jury could still consider Copart's failure to advertise the frame damage in the auction listing as *circumstantial* evidence of its intent to fraudulently conceal the title defect because the frame damage was, in large part, why a salvage title should have been applied to the trailer before the first sale.  Therefore, the jury could have construed Copart's failure to describe the frame damage as an intent to pass the trailer off as having a clean title.  While this evidence is circumstantial, intent is usually shown by circumstantial evidence.  *See, e.g.*, *Harvey v. Harvey*, 841 P.2d 375, 377 (Colo. App. 1992).

¶ 38    Thus, taken in the light most favorable to McCurdy, there was enough evidence of intent to support the trial court's denial of Copart's motion for a directed verdict on the fraudulent concealment or nondisclosure claim.

### 4.    CCPA

¶ 39    Next, Copart contends that the trial court erred by failing to grant its motion for directed verdict on the CCPA claim.  We agree.

¶ 40    To prevail on a private CCPA claim, a plaintiff must prove

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of

defendant's business, vocation, or occupation; (3) *that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property*; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003) (emphasis added) (quoting *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)).

¶ 41     In contending that McCurdy's CCPA claim fails, Copart maintains that McCurdy failed to introduce sufficient evidence to prove the third prong — that the alleged deceptive trade practice significantly impacted the public. We agree with Copart and reverse the judgment as to this claim on this basis.

¶ 42     "To prove a violation of the CCPA, a plaintiff must show not only an unfair or deceptive trade practice, but also that the practice 'significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property.'" *Shekarchian v. Maxx Auto Recovery, Inc.*, 2019 COA 60, ¶ 39 (quoting *Hall*, 969 P.2d at 235). "[I]f a wrong is private in nature and does not affect the public, a claim is not actionable under the CCPA." *Id.* (citing *Rhino Linings*, 62 P.3d at 149).

¶ 43     When assessing public impact, the following factors must be considered: "(1) [t]he number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 25 (Colo. App. 2010) (quoting *Rhino Linings*, 62 P.3d at 149).  None of these factors are determinative, and it isn't necessary that all the factors be present.  *Shekarchian*, ¶ 42.

¶ 44     While no single factor is determinative, as discussed below, McCurdy failed to sufficiently prove *any* of these factors at trial.  We address the evidence regarding each factor below.

          a.     The Number of Consumers Directly Affected

¶ 45     First, McCurdy failed to demonstrate that a significant number of consumers were affected or potentially affected by Copart's failure to properly title the vehicles it auctions.  In particular, she presented scant evidence on the number of consumers *directly* affected by Copart's alleged practice of mistitling salvage vehicles.  While McCurdy presented evidence that five Copart members had

purchased the trailer at issue in this case, there was no evidence that this was a widespread or regular practice that affected a significant number of consumers.[4]

¶ 46　Further, the evidence suggests that Copart didn't market the trailer — or its inventory generally — to the general public. Rather, because of its business model, the trailer, like all its auctions, was marketed only to members of Copart. Thus, while Copart markets throughout the United States, the number of actual bidders is limited, which reduces the number of consumers directly affected by Copart's deceptive practice. *Cf. Colo. Coffee Bean*, 251 P.3d at 25 (discerning no direct effect on "persons who merely read the Internet posting or those who responded to it, but were screened out by [the franchise]").

---

[4] To the extent McCurdy's claim of public impact rests on the number of Copart customers affected by the fraudulent (and repeatedly disrupted) sale of this particular trailer, we reject the notion that the repeated sale of this single item, standing alone, can satisfy the significant public impact element of McCurdy's CCPA claim. *See, e.g., Crowe v. Tull*, 126 P.3d 196, 211 (Colo. 2006) (If a CCPA plaintiff "fails to allege an injury other than a private wrong . . . , the injury will lack public impact and will be too narrow in scope to be covered by the CCPA.").

¶ 47    Citing *Shekarchian*, ¶ 49, McCurdy points to a single line of testimony for the proposition that "Copart handled this trailer consistently with its standard practices," which, she argues, supports "the reasonable inference that other consumers were also affected."  But that testimony, when viewed in context, hardly establishes that the deceptive practice alleged here is a standard practice:

> [McCurdy's Counsel:] . . . [W]hat about in Colorado, how many vehicles does Copart sell a year?
>
> [Dannylee Lamaack:] On average here a year, I'm not sure of the exact answer; but I know we run roughly about 1,200 a week.
>
> [McCurdy's Counsel:] Okay.  Is that just one Colorado location or is that all four of them?
>
> [Lamaack:] I would have to look further into that.  I know that is about one location.
>
> [McCurdy's Counsel:] Okay.  So it's likely similar numbers at the other locations?
>
> [Lamaack:] They are all three different sized locations, correct.
>
> [McCurdy's Counsel:] *Okay.  And is it fair to say that Copart handled this vehicle the way it handles most vehicles*?

23

[Lamaack:] *For the location and the information provided and the way the assignment was created, correct.*

[McCurdy's Counsel:] And it's the company's position in this case that no mistakes were made?

[Lamaack:] I wouldn't be for sure 100 percent in regards to that.

[McCurdy's Counsel:] Okay. You're not aware of anybody at the company being disciplined or written up for this case?

[Lamaack:] To my knowledge, no.

(Emphases added.)

¶ 48    To be sure, evidence that that a deceptive trade practice is standard operating procedure can be strong evidence that a challenged practice has or will affect a significant number of consumers. *Shekarchian* is a good example. In that case, the defendant ran an automobile repossession service and impound lot, and the challenged deceptive trade practice was that the defendant would force vehicle owners to sign a liability release without an opportunity to inspect their vehicle as a condition of getting their vehicles back. *Shekarchian,* ¶¶ 2, 4, 40. On appeal, the defendant contended that there was no evidence that this practice had a significant public impact because it didn't affect a sufficient number

of consumers.  *Id.* at ¶ 48.  In rejecting this contention, the division cited the testimony of an employee of the defendant who said it was the defendant's "'standard operating procedure' . . . to refuse to return the owner's car unless [the owner] sign[ed] the release prior to an inspection of the vehicle" — the very practice at issue in the case.  *Id.* at ¶ 49.  Based on this, the division concluded that "the evidence supported a reasonable inference that [the defendant] engage[d] in the unfair or deceptive practice in virtually every interaction with consumers."  *Id.* (citing *Crowe v. Tull,* 126 P.3d 196, 209 (Colo. 2006)).

¶ 49    The evidence McCurdy cites, even when viewed in the light most favorable to McCurdy, doesn't support a similar inference. Vague testimony that this transaction was generally handled as most other transactions isn't evidence that the particular alleged deceptive trade practice is standard operating produce.

¶ 50    And McCurdy points to another brief passage of testimony for the proposition that a representative of "APB Motors testified to other instances of non-disclosure by Copart."  But here's that testimony in context:

[Copart's Counsel:] . . . [Y]ou would agree that from your experience, Copart's auctions have been reputable and generally not in a position to not disclose information to you as a potential consumer?

[Anastasia Bondarenko:] In my experience, we have had some things that weren't disclosed.

[Copart's Counsel:] Okay. Like what things?

[Bondarenko:] Again, we had where vehicles said run and drive, but it had completely underneath everything smashed and damaged, so there is no way that would be run and drive. That's something that we get and we can't prove it to Copart that, hey, you guys didn't describe it as is, but that's how it is.

[Copart's Counsel:] You haven't experienced numerous series of situations where you've had title issues by purchasing vehicles from sellers at Copart?

[Bondarenko:] We did have — not too much, but a couple of times where we purchased a vehicle that was disclosed as a clean title and we get a salvage title. We had that maybe a couple of times.

[Copart's Counsel:] *Once or twice out of the thousands that you purchased*?

[Bondarenko:] *Yes.*

(Emphases added.)

¶ 51    Again, this testimony doesn't support the conclusion that the alleged deceptive trade practice had a significant public impact. If

anything, it supports the opposite: that this was a one- or two-in-a-thousand occurrence for one Copart member. *See Rhino Linings*, 62 P.3d at 150 ("Three affected dealers out of approximately 550 worldwide does not significantly affect the public . . . ."). Simply put, the testimony McCurdy cites to support that she presented evidence of "widespread dissemination of false information" doesn't bear the weight placed on it.

b.  Relative Sophistication and Bargaining Power of the Consumers

¶ 52    Second, McCurdy failed to demonstrate a disparate level of sophistication or bargaining power between Copart and herself or between Copart and its customers. The evidence presented at trial indicated that most of Copart's members were dealers. Indeed, the record shows that most, if not all, of the purchasers of the trailer at issue, including Scarpa, were dealers.[5] Thus, while McCurdy herself may not have been a sophisticated purchaser with bargaining power, Scarpa and the other dealers were.

---

[5] It's not clear from the record whether "Mac Scooters" — the second purchaser of the trailer — was a dealer.

¶ 53    McCurdy points to evidence from trial that she says demonstrates that Copart had and wielded superior bargaining power over its dealer-customers by "blacklisting dealers who challenge[d] them."  The testimony from the owner of Scarpa Motors that McCurdy cites is as follows:

> [McCurdy's Counsel:] Now, does your company still purchase cars from Copart?
>
> [Scarpa Motors Owner:] No.
>
> [McCurdy's Counsel:] Why not?
>
> [Scarpa Motors Owner:] They suspended our license.
>
> . . . .
>
> [McCurdy's Counsel:] . . . [W]hat is your understanding of why you were suspended?
>
> [Scarpa Motors Owner:] I think they wanted us to indemnify this whole issue.  I was spending close to 2 million [dollars] a year with them and they just said we should indemnify them. I said I wasn't suing Copart, so I didn't feel I was — it was unjustified what they did.

¶ 54    This testimony demonstrates little more than that the particulars of this private transaction — and Scarpa's refusal to indemnify Copart against McCurdy's suit — resulted in Copart discontinuing its relationship with Scarpa Motors.  While this

approach may have been heavy-handed, this testimony, without more, doesn't demonstrate, or even imply, a general or widespread practice by Copart to "blacklist dealers who challenge them," as McCurdy contends.

¶ 55    Simply put, the evidence presented at trial, when viewed in the light most favorable to McCurdy, is insufficient to show that there was a disparate level of sophistication or bargaining power in this transaction or in other transactions at Copart auctions.  And sophisticated purchasers with bargaining power aren't the type of consumer the CCPA protects.  *See Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998) ("The CCPA provides consumers who are in a position of relative bargaining weakness with protection against a range of deceptive trade practices.").

### c.    Evidence that the Challenged Practice Has Previously Impacted Other Consumers or Has the Significant Potential to do so in the Future

¶ 56    Third, McCurdy didn't introduce sufficient evidence that the practice of mistitling vehicles has previously affected other consumers or has significant potential to do so in the future.

¶ 57    Again, while there was some testimony that Copart had mistitled vehicles in the past, there was no indication that it had

29

negatively impacted previous consumers or that the practice was so extensive that there was a significant potential it would impact consumers in the future.

¶ 58    In short, examining each of the factors separately and together, McCurdy failed to demonstrate that Copart's deceptive practice significantly impacted the public.  Because there was insufficient evidence presented at trial that Copart's deceptive practice affected the general public, the trial court erred by not granting Copart's motion for directed verdict on the CCPA claim. And therefore, the ruling must be reversed.

## C.    Motion for a New Trial

¶ 59    Copart next contends that the trial court erred by denying its motion for a new trial on the grounds that (1) the trial court gave the jury improper instructions on state salvage title laws, and (2) the damages awarded to McCurdy at trial were excessive.  After addressing the standard of review, we consider and reject each contention in turn.

### 1.    Standard of Review

¶ 60    When ruling on a motion for a new trial, trial courts have "considerable discretion," and we won't disturb the trial court's

ruling "absent a clear showing of an abuse of discretion." *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 502 (Colo. App. 2011). A trial court abuses its discretion if its "ruling was manifestly arbitrary, unreasonable, or unfair, or was based on a misunderstanding or misapplication of the law." *Bd. of Cnty. Comm'rs v. DPG Farms, LLC*, 2017 COA 83, ¶ 34.

### 2. Jury Instructions on State Salvage Title Law

¶ 61 We first address Copart's contention that the trial court erred by denying its motion for a new trial because the jury received improper instructions.

### a. Additional Facts

¶ 62 Notwithstanding the fact that the trailer in this case was originally titled and sold in Michigan, during trial, multiple witnesses offered conflicting testimony about the requirements of Colorado law surrounding salvage title. This testimony was elicited by counsel for both Copart and McCurdy, and neither party objected to the testimony.

¶ 63 Near the end of trial, the court held a jury instruction conference at which the parties discussed a proposed jury instruction on Colorado salvage law in addition to Michigan salvage

law.  Counsel for Copart objected to a portion of the instruction because it instructed the jury that "if there was ever a total loss, it's salvage here in Colorado."  And because there had been testimony about the trailer being deemed a "total loss," Copart was concerned the jury would disregard Michigan law when determining whether Copart should have applied a salvage title to the trailer.  Copart also asserted that the instruction on total loss shouldn't be given at all because McCurdy's second amended complaint didn't make "any particular allegations [that] Colorado law as [to] total loss should [have] been applied."

¶ 64     In response to Copart's objection, the court expressed its concern that the jury would be confused without the instruction because multiple witnesses had testified about Colorado law while being examined by both Copart and McCurdy.  Copart then renewed its objection, stating that because McCurdy didn't include a "total loss" allegation in her second amended complaint, Copart wasn't defending against whether a total loss occurred.

¶ 65     Ultimately, the trial court determined that it was necessary to give an instruction on Colorado salvage law that included language about total loss.  In making this determination, the court reiterated

that the instruction was necessary because there was testimony by witnesses, including Copart employees, about total loss, some of which was inaccurate. The court reasoned that, given the testimony presented on total loss, the jury would be left "hanging," and, given the inaccuracies in witness testimony, it might affect the jury's ability to make a credibility analysis. But, understanding Copart's concerns and in an apparent effort to ameliorate its concerns about confusing the jury, the trial court included an instruction stating that Michigan law applies to transactions in Michigan, and Colorado law applies to transactions in Colorado. Copart didn't expressly object to this instruction but reasserted its objection to instructing the jury on the total loss language in the Colorado salvage law instruction.

¶ 66 The trial court instructed the jury on Colorado salvage law in instruction 30 as follows:

> Under Colorado law, "salvage vehicle" is defined as:
>
> 1. A flood-damaged vehicle; or
>
> 2. A vehicle branded as a salvage vehicle by another state;

3. A vehicle that is damaged by collision, fire, flood, accident, trespass, or other occurrence, excluding hail damage or theft, to the extent that the vehicle is determined to be a total loss by the insurer or other person acting on behalf of the owner or that the cost of repairing the vehicle to a roadworthy condition and for legal operation on the highways exceeds the vehicle's retail fair market value immediately prior to the damage, as determined by the person who owns the vehicle at the time of the occurrence or by the insurer or other person acting on behalf of the owner.

¶ 67    The trial court also gave the jury instruction 31:

Michigan law applies to transactions that occurred in Michigan.

Colorado law applies to transactions that occurred in Colorado.

¶ 68    In its motion for a new trial, Copart again raised concerns over instruction 30 and also raised concerns over instruction 31. In denying the motion, the trial court found that giving the instructions wasn't error because compliance with Colorado title law was presented at trial, and the instructions were necessary to avoid confusion and assist the jury in determining the credibility of witnesses.

## b. Preservation

¶ 69    McCurdy contends that Copart failed to preserve for our review the issue of whether the trial court erred by giving instruction 31. Generally, issues may not be addressed for the first time on appeal. *In re Marriage of Mack*, 2022 CO 17, ¶ 12. But we need not decide whether an issue is preserved if we conclude, as we do here, that a party's argument is unavailing. *See id.*

## c. Legal Principles and Standard of Review

¶ 70    A trial court has a duty to correctly instruct the jury on "all matters of law." *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). We review whether a particular instruction correctly states that law de novo. *Id.* To determine whether the jury instructions accurately informed the jury of the law, we read and consider all the instructions together as a whole. *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1378 (Colo. App. 1996). As long as a particular instruction properly informs the jury of the law, a trial court has broad discretion to determine its form and style. *Day*, 255 P.3d at 1067. And when an instruction accurately states the law, "we review a trial court's decision to give a particular jury instruction for an abuse of discretion." *Id.* But "[a]n instruction which misleads or

confuses the jury amounts to error." *Williams*, 928 P.2d at 1377.

An improper jury instruction, however, "is not grounds for reversal unless it prejudices a party's substantial rights." *Clough v. Williams Prod. RMT Co.,* 179 P.3d 32, 40 (Colo. App. 2007).

d. The Trial Court Didn't Err

¶ 71 We aren't persuaded that jury instructions 30 and 31 were improper or that the trial court abused its discretion by giving them.

¶ 72 First, both instruction 30 and instruction 31 are accurate statements of the law. And second, neither instruction 30 nor instruction 31 were confusing or misleading. Rather, as the trial court observed, jury instructions 30 and 31 were necessary to avoid confusing or misleading the jury.

¶ 73 The record supports the trial court's determination that jury instruction 30 was necessary. We reach this conclusion for two reasons. First, because witnesses for Copart testified incorrectly about Colorado law. Second, it was necessary for the jury to decide the CCPA claim because the CCPA instruction stated, "A defendant engages in a deceptive trade practice if, in the course of its business, the defendant: . . . [f]ails to disclose in writing, prior to

36

sale, to the purchaser that a motor vehicle is a salvage vehicle, *as defined under Colorado law.*" (Emphasis added.)

¶ 74    Still, Copart contends that the jury may have answered the question of whether the trailer should have been salvaged differently if instruction 30 hadn't been given. But nothing in the record supports this contention. And on appeal, "[w]e must presume the jury understood and followed" the jury instructions. *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1202 (Colo. App. 2009).

¶ 75    Regardless of the necessity of the instruction, any confusion it created was reduced or eliminated by the parties' closing arguments. Indeed, during closing, counsel for both McCurdy and Copart informed the jury that the trailer's salvage title depended on Michigan law, not Colorado law. Copart's counsel, in particular, informed the jury that Copart used Michigan laws to determine whether the trailer needed a salvage title, and both Copart's counsel and McCurdy's counsel repeatedly emphasized that the salvage title's applicability depended on the trailer's weight — a consideration that is only necessary under Michigan law.

¶ 76    Because it was necessary for the trial court to instruct the jury on both Michigan salvage title law and Colorado salvage title law, instruction 31 was necessary to avoid confusing the jury. That the trailer was ultimately sold in Colorado doesn't make instruction 31 improper. Rather, it was up to the parties to further argue whether Colorado or Michigan law applied to either the fraudulent nondisclosure or CCPA claim.

¶ 77    Thus, because there was testimony about Colorado law, and because an element of the CCPA claim required the jury to understand Colorado law, the trial court didn't abuse its discretion by giving jury instruction 30. And because jury instruction 31 was necessary to clarify when Michigan law applied and when Colorado law applied, the trial court didn't abuse its discretion by giving jury instruction 31.

### 3.    Noneconomic Damages

¶ 78    We next address Copart's contention that the trial court erred by denying its motion for a new trial because the damages the jury awarded McCurdy at trial were excessive.

### a. Additional Facts

¶ 79 In the joint trial management certificate filed in advance of trial, McCurdy asserted that she would be requesting approximately $54,000 in economic damages, and noneconomic damages in an amount "to be determined by the trier of fact." Copart doesn't point to, and we can't find, record evidence that Copart objected to McCurdy's lack of specificity about the requested noneconomic damages.

¶ 80 During trial, McCurdy offered some testimony regarding how the transaction affected her. Specifically, she testified to the following:

- She "got really nervous" because her husband had to pull the trailer over on a two-lane highway with cars "zipping by."

- While stopped on Monarch Pass, McCurdy's husband tried to keep the trailer from "falling over," and she was "losing her mind thinking it's going to fall on top of him."

- She still makes payments on the trailer even though she can't use it, and it's "[d]evastating."

- After the "situation with the trailer," she doesn't "trust as much as [she used] to, [she has] a hard time taking people at their word."

- The situation with the trailer "has affected [her] sleeping because . . . [she is] paying out money on something that [she] can't use."

- The situation with the trailer affected her "thought process," and she "made a couple of mistakes at work."

- The purchase of the trailer has "negatively" affected her relationship with her husband "because he . . . wants to get another [trailer]; however [she] dug [her] heels in because . . . it's not an option for [her]."

¶ 81    McCurdy's husband also testified that the purchase of the trailer and the situation near Monarch Pass had negatively affected McCurdy.  Specifically, he testified that McCurdy

- "lost her appetite and she didn't eat for a very long time and she wasn't sleeping";

- "got irritable with just everything" and said "we're not getting a new trailer," which has "caused a lot of issues"; and

- "used to be more fun" and now "is more closed off" and "not as willing to go off and do stuff like she used to be."

¶ 82 It doesn't appear that the McCurdys were asked to quantify this stress, but they confirmed that no one in their family was physically injured, and McCurdy's husband testified that McCurdy hadn't been diagnosed with post-traumatic stress disorder.

¶ 83 Although the McCurdys didn't place any specific monetary value on this stress during their testimony, counsel did suggest a dollar amount in closing. During closing argument, McCurdy's counsel discussed her emotional distress, stating, "[T]hat's the biggest part of this. And you got to find how much is that worth to her to go through." McCurdy's counsel then stated, "I'm going to suggest the number to you and the number that I suggest is [$]700,000. You may think it should be higher, you may think it should be lower, and that's fine, because that is the power you have. You get to decide how much it's worth." It doesn't appear that either McCurdy's counsel or Copart's counsel stated a precise basis for quantifying the McCurdys' noneconomic damages or further commented on the amount of noneconomic damages.

¶ 84    During deliberations the jury asked, "How did [McCurdy's] lawyer calculate $700,000 in damages?"  The court declined to answer the question, responding that the jury had "received all of the testimony and exhibits that are to be considered as evidence in this case."  The jury returned a verdict awarding McCurdy $700,000.

¶ 85    In its motion for a new trial, Copart argued that the $700,000 verdict was excessive and not supported by the evidence.  Copart noted that McCurdy never submitted any medical records to support a "psychological diagnosis," didn't present expert testimony about the existence of her stress, and testified that she didn't suffer personal injury "inclusive of not seeking any psychological counseling or mental health treatment of any kind."  Copart also indicated that, while McCurdy stated that she was seeking noneconomic damages, the $700,000 request "was a complete surprise."

¶ 86    The trial court disagreed that the damages weren't supported by the evidence or that they were excessive, finding "evidentiary support in the record for both the economic and noneconomic injury" and concluding that the testimony presented was

"sufficiently probative" of whether McCurdy suffered noneconomic damages and not based on speculation or conjecture.

### b. Applicable Legal Principles

¶ 87 The amount of damages awarded "is within the sole province of the jury, and an award will not be disturbed unless it is completely unsupported by the record or if it is so excessive as to indicate that the jury acted out of passion, prejudice, or corruption." *Averyt v. Wal-Mart Stores, Inc.*, 265 P.3d 456, 462 (Colo. 2011). An award of damages "may not be based on speculation or conjecture." *Tisch*, ¶ 67. The reasonableness of an award, however, is "always subject to judicial scrutiny in the post-trial and appellate stages of a case." *Averyt*, 265 P.3d at 462.

¶ 88 Pursuant to C.R.C.P. 59(d)(5), "[e]xcessive or inadequate damages" are grounds for a new trial. When a damages award is manifestly excessive in light of the evidence presented, the trial court may grant a new trial or, alternatively, deny a new trial conditioned on a plaintiff's agreement to remittitur of any damages deemed to be excessive. *Jagow v. E-470 Pub. Highway Auth.*, 49 P.3d 1151, 1157 (Colo. 2002).

### c. A New Trial Isn't Warranted

¶ 89    Copart argues that McCurdy "provided no substantial evidence to support the jury's verdict," but the record belies this contention. As detailed above, at trial McCurdy presented evidence that (1) when the trailer experienced issues on Monarch pass, she was "nervous"; (2) because of the incident and because she had to make payments on a trailer she couldn't use, her sleeping, eating, and "thought process" have been affected; and (3) after purchasing and experiencing issues with the trailer, she isn't as trusting, and her relationship with her husband has been "negatively" affected.

¶ 90    Though perhaps thin, this is enough to support the jury's award of noneconomic damages.

¶ 91    Copart points out that McCurdy didn't "provide any expert testimony or medical records to indicate that she suffered from [post-traumatic stress disorder], stress, or other psychological diagnosis, as a result of the [t]railer purchase" and that she admitted she didn't have bodily injury "inclusive of not seeking any psychological counseling or mental health treatment of any kind . . . as a result of the purchase of the [t]railer."  While it's true that McCurdy didn't present any expert testimony, medical records, or

44

testimony that she sought treatment, such documentation and testimony isn't necessary to demonstrate that she suffered noneconomic damages. *See Palmer v. Diaz*, 214 P.3d 546, 552 (Colo. App. 2009) ("Substantial evidence is that which is probative, credible, and competent. It is evidence of a character that would warrant a reasonable belief in the existence of facts supporting a particular finding, without regard to the existence of contradicting testimony or contradictory inferences.").

¶ 92 Copart also notes that the economic damages presented at trial "equated to just under 12% of the total $700,000 verdict" and contends that the jury's question about how McCurdy calculated the amount of damages supports its contention that there wasn't substantial evidence "for the high dollar request." But it's inconsequential that the economic damages constituted a small fraction of the total award and that the jury asked how the damages request was calculated. Copart doesn't cite case law supporting its argument that a jury can't award significantly greater noneconomic damages than the estimated amount of economic damages alleged. There is similarly a lack of support for Copart's argument that the jury's question regarding the total damages requested indicated

45

that it was confused by McCurdy's request. That the jury questioned the basis for the total damages request doesn't necessarily indicate confusion. Indeed, as the trial court stated in its denial of Copart's motion, it could merely indicate that the jury was engaging in a calculation of damages.

¶ 93 Thus, given the evidence established at trial, the trial court didn't abuse its discretion by denying Copart's motion for a new trial.

### D. Delineation of Damages

¶ 94 Copart next contends that the trial court erred by trebling the entire damages because there wasn't a delineation of damages on the verdict form. Because we reverse the judgment relating to the CCPA claim, we need not address this contention.

### E. Attorney Fees Motion

¶ 95 After trial, McCurdy filed a motion requesting attorney fees under section 6-1-113, based on the jury's verdict in her favor on the CCPA claim. Copart objected to this motion and requested a hearing to address it. According to Copart, the trial court never ruled on the motion.

¶ 96    In this appeal, Copart contends that because the trial court didn't rule on the motion within sixty-three days of it being filed, the motion was deemed denied under C.R.C.P. 59(j).  Based on this, Copart suggests that we should confirm the implied denial of the motion.

¶ 97    But Copart is wrong about the effect of the trial court's failure to rule on McCurdy's motion for attorney fees within the timeframe in C.R.C.P. 59(j).  Indeed, "requests for costs and attorney fees are outside the purview of C.R.C.P. 59(j)'s requirement that a motion be denied as a matter of law if it is not decided on within sixty[-three] days." *Anderson v. Pursell*, 244 P.3d 1188, 1195 (Colo. 2010) (applying a former version of C.R.C.P. 59(j)).  Simply put, nothing about the motion for attorney fees is before us, so we offer no opinion regarding the pending request (or any order the trial court may issue regarding it).

### III.   Disposition

¶ 98    The judgment is affirmed in part and reversed in part.  On remand, the trial court should dismiss the CCPA claim and enter a new judgment, consistent with this opinion, based on the fraudulent nondisclosure claim.

JUDGE KUHN and JUDGE SCHUTZ concur.